Angel G. LUEVANO, et al., Plaintiffs,

v.

Alan CAMPBELL, Director, Office of Personnel Management, et al., Defendants.

Civ. A. No. 79–0271.

United States District Court, District of Columbia.

Nov. 19, 1981.

Richard T. Seymour, Lawyers' Committee for Civil Rights Under Law, Elaine R. Jones and Barry L. Goldstein, Washington, D.C., Jack Greenberg, Charles Stephen Ralston, Patrick O. Patterson, Gail J. Wright, New York City, Jack G. Knebel, McCutchen, Doyle, Brown & Enersen, Vilma S. Martinez, Morris J. Baller, Mexican American Legal Defense and Educational Fund, John H. Erickson, Erickson, Beasley & Hewitt, San Francisco, Cal., Kenneth Kimerling, Puerto Rican Legal Defense Fund, New York City, for plaintiffs.

Stuart E. Schiffer, Acting Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., Barbara B. O'Malley, Paul Blankenstein, Barbara L. Ward, Shirley Huang, Mark A. Chavez, Attys., Dept. of Justice, Washington, D. C., for defendants.

## ORDER MODIFYING THE LIST OF DEFENDANT CLASS MEMBERS

JOYCE HENS GREEN, District Judge.

The parties have jointly approached the Court and requested modification of the list of members of the defendant class in this case, attached to the proposed Consent Decree as Appendix B. For good cause shown, it is hereby

ORDERED, that:

1. (a) The Federal Reserve System, which is comprised of the Board of Governors and twelve separately chartered regional Federal Reserve Banks, is deleted from the list of defendant class members. Section 11(l) of the Federal Reserve Act of 1913, 12 U.S.C. § 248(l), gives the Board of Governors independent hiring authority without regard to civil service laws and regulations governing selection for the competitive service. Through counsel for the government in this case, the Board of Governors represents that it has never in the past used the PACE in its hiring or promotions and that it has no intention of doing so in the future. Counsel for plaintiffs accept this representation. If, during the period of retention of jurisdiction, the Board should for any reason come to use, in its hiring, certificates of eligibles based in whole or in part on the results of the PACE for any of the job categories listed in Appendix A to the proposed Consent Decree, the government shall immediately notify the Court and counsel for plaintiffs, so that the status of the Board as a nonmember of the defendant class may be re-examined.

(b) Counsel for the government represent that the regional Federal Reserve Banks are non-government corporations and are not subject to § 717 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16. See generally 12 U.S.C. §§ 282, 323, 341. Counsel for the government further represent that the regional Federal Reserve Banks have never in the past used the PACE in their hiring or promotions, and have no intention of doing so in the future. As such, the regional Federal Reserve Banks are not properly members of the defendant class. Counsel for plaintiffs accept these representations. If, during the period of retention of jurisdiction, the status of the Federal Reserve Banks with respect to coverage under § 717 changes and if any of them should for any reason come to use, in its hiring, certificates of eligibles based in whole or in part on the results of the PACE for any of the job categories listed in Appendix A to the proposed Consent Decree, the government shall immediately notify the Court and counsel for plaintiffs, so that the status of the regional Federal Reserve Banks as nonmembers of the defendant class may be re-examined.

2. The Nuclear Regulatory Commission is deleted from the list of defendant class

members. Section 161(d) of the Atomic Energy Act of 1954, 42 U.S.C. § 2201(d), gives the Commission independent hiring authority without regard to civil service laws and regulations governing selection for the competitive service. Through counsel for the government in this case, the Commission represents that it has never in the past used the PACE in its hiring or promotions and that it has no intention of doing so in the future. Counsel for plaintiffs accept that representation. If, during the period of retention of jurisdiction, the Commission should for any reason come to use, in its hiring, certificates of eligibles based in whole or in part on the results of the PACE for any of the job categories listed in Appendix A to the proposed Consent Decree, the government shall immediately notify the Court and counsel for plaintiffs, so that the Commission's status as a nonmember of the defendant class may be re-examined.

3. In light of the enactment of the General Accounting Office Personnel Act of 1980, Pub.L. 96–191, 94 Stat. 27, which provides that the General Accounting Office ["GAO"] shall establish its own merit system independent of the authority of the U.S. Office of Personnel Management ["OPM"], and which provides that the Comptroller General and the GAO Personnel Appeals Board, respectively, shall exercise the various authorities granted to the U.S. Equal Employment Opportunity Commission under § 717 of the Civil Rights Act of 1964, the obligations of the proposed Consent Decree shall, with respect to positions in GAO, be modified as follows:

a) Instead of reporting statistical and other information to OPM, GAO may at its option report such information directly to the United States Department of Justice and to plaintiffs, if it uses the same format and reporting methods used by OPM;

b) With respect to positions in GAO presently or formerly subject to the PACE requirement, the provisions of ¶¶ 13(a), 16(e), 17(c), 17(i), 27, and 30 shall bind GAO, and GAO shall have the rights and obligations of OPM and of the EEOC under these provisions of the Consent Decree; and

c) With respect to positions in GAO presently or formerly subject to the PACE requirement, the provisions of ¶¶ 12–34 (with the exception of ¶ 16(d)) shall bind GAO, and GAO shall have the rights and obligations of all other defendant class members under these provisions of the Consent Decree. Where necessary, in order to comply with the Consent Decree, GAO shall develop the types of programs described therein.

ORDER GRANTING FINAL APPROVAL
TO THE CONSENT DECREE

On January 29, 1979, plaintiffs, representing a nationwide class of blacks and of Hispanics, instituted this action alleging that the Professional and Administrative Career Examination (PACE) discriminates against class members in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* After two years of litigation and settlement negotiations, the parties jointly moved on January 9, 1981 for an order granting preliminary approval to a Consent Decree and for the purpose of providing notice of the settlement to class members. This motion was granted on January 15, 1981. On February 24, 1981, the parties moved to amend the Consent Decree and for the entry of an order granting preliminary approval to the Decree as amended, and for the purpose of providing notice to class members. The Court granted this motion on February 26, 1981.

A number of written comments by class members have been received and considered. Fairness hearings were held before this Court on May 27 and on June 16, 1981. The record has been supplemented by deposition testimony and by further submissions of the parties. The Court is now in a position to rule on the matter.

I. *Findings of Fact*

A. *The PACE Hiring System*

1. The Professional and Administrative Career Examination (PACE) is an assessment instrument used by defendant Office

of Personnel Management (OPM) and its predecessor, the United States Civil Service Commission, to identify qualified individuals for consideration for employment in entry-level GS–5 or GS–7 jobs for 118 professional and administrative occupations in the Federal service. Defendants' Response to Plaintiffs' Rule 36 Request for Admissions, No. 1. A list of the occupations covered by PACE is contained in Appendix A to the Consent Decree.

2. In order to compete for an entry-level PACE job, the applicant must have a four-year college degree, or three years of professional experience, or the equivalent combination of experience and education. Over 90 percent of those individuals who compete in the PACE are college graduates, or will be graduated from college within nine months. The applicant must fill out an application form and take a written test. The written test scores are converted into numerical ratings. The lowest possible rating is 40. In order to be considered for competitive appointment, an individual must attain a minimum rating of 70, unless the applicant qualified for outstanding scholar credit. In that case, 100 is added to the earned rating and the sum is divided by two, thus ensuring a rating of at least 70, which would make all outstanding scholars eligible. Defendants' Response to Plaintiffs' Rule 36 Request for Admissions, No. 2.

3. In accordance with 5 U.S.C. § 3309, individuals who are eligible for Veteran's Preference have additional points added to their ratings if they attain the minimal rating of 70 on the written test, or achieve the rating of 70 on the basis of qualification as an outstanding scholar. There are several kinds of Veteran's Preferences. Five-point Tentative Preference (TP) is authorized if the veteran has served an appropriate term of military service. Ten-point Compensable Preference (CP) is authorized if the veteran incurred a service-connected disability of 10 percent or more. Finally, ten-point Other Preference (XP) is autho-

rized if the applicant is the mother of a veteran who died on active duty, the surviving spouse of a deceased veteran, or under certain conditions, the spouse of a disabled veteran. Ratings for an eligible veteran may range, depending upon the type of preference accorded, from 75 to 105 or from 80 to 110. Defendants' Response to Plaintiffs' Rule 36 Request for Admissions, No. 4.

4. After eligible individuals with ratings of 70 or more have been identified, OPM prepares a rank-order list of eligible applicants. In accordance with the controlling statute, all eligible CP veterans, regardless of their numerical ratings, are placed at the top of the list. Both eligible TP and XP veterans are listed along with non-veterans in order of their ratings, but such veterans are always placed above non-veterans who possess the same numerical rating. Defendants' Response to Plaintiffs' Rule 36 Request for Admissions, No. 5.

5. An agency seeking to fill a position in any of the 118 PACE occupations is not required to utilize the PACE register, but may elect to fill the position through internal processes such as promotion, reassignment or transfer of current Federal employees.* The decision whether to fill a PACE position with a Federal employee or to rely on the PACE register is within the discretion of the agency. Defendants' Response to Plaintiffs' First Interrogatories, No. 6. Thus, use of the PACE register for selection of applicants for PACE occupations is not now and has never been a mandatory requirement. Defendants' Response to Plaintiffs' First Set of Interrogatories, No. 7(b).

6. If an agency has a vacant position in a PACE job category and chooses to fill that job from the PACE register, the agency requests from the local OPM area office a list of the names of PACE candidates. This list is referred to as a "certificate." The agency selects from among the candidates listed on this certificate. In considering certified candidates, the agency must

---

\* Current Federal employees are not barred from competing with other PACE applicants. In such a case, however, they are subject to the same considerations for appointment as all PACE applicants, regardless of their status as employees.

follow the "rule of three," 5 U.S.C. § 3318, under which it can select any of the top three available rating-ordered PACE candidates, with special consideration given to veterans as required by statute. The selecting official may not generally by-pass a veteran in order to choose a same or lesser-rated non-veteran. Defendants' Response to Plaintiffs' Rule 36 Request for Admissions, No. 6.

7. No PACE applicant is guaranteed selection for or appointment to a PACE position. Use of the PACE register to obtain names of candidates for PACE positions lies within the discretion of the hiring agency. Finding No. 5. Moreover, individuals who are eligible to have Veterans Preference points added to their ratings may, depending upon the type of preference accorded, possess ratings in the range of 100 to 110. Finding No. 3. Thus, in many areas and for many jobs, due to the large number of applicants with high PACE ratings, a rating of 90 or higher is generally necessary in order for the applicant to be referred to an employing agency for consideration for appointment. Defendants' Response to Plaintiffs' Rule 36 Request for Admissions, No. 2. Even PACE applicants with high PACE ratings cannot, however, be assured of obtaining a PACE position. There are a number of other factors which may be considered by OPM or by the hiring agency in filling PACE positions. In preparing a certificate for a particular position, OPM may consider, at the request of the agency, additional requirements for PACE jobs such as, for example, knowledge of a specific foreign language, and certify qualified candidates for that position in score order ahead of other eligible candidates on the PACE

register. Defendants' Response to Plaintiffs' Rule 36 Request for Admissions, No. 7. There are also certain occupations subject to the PACE requirement which require a specific educational background. (Deposition of plaintiffs' expert, Dr. James L. Outtz, Tr. 16–21; U.S. Office of Personnel Management Handbook X–118: Qualification Standards for Positions Under the General Schedule (1975; periodic updates)).[1] In addition, applicants taking the PACE are required to specify the geographic areas in which they prefer to work, their willingness to take a temporary or a part-time position in a PACE job, their interest in broad categories of jobs among the different types subject to the PACE requirement, and a number of other factors. All of these specifications must be matched with actual job openings before the applicant will be considered. (Outtz deposition, Tr. 30–31; Exhibit 1 to the Outtz deposition). Thus, even if an applicant obtains a sufficiently high PACE rating to warrant referral to an agency, he is still subject to further screening by the agency. In sum, the fact that a PACE applicant receives a rating over 70, and is therefore technically eligible for consideration in the event his or her rating is sufficiently high for referral to the hiring agency, by no means assures him or her of being selected for a PACE position.

B. *Statistics Concerning Use Of The PACE*

8. The written test portion of the PACE was first administered during the Fall of 1974. Records maintained by OPM indicate that the number of individuals who took the PACE and the number of PACE applicants who were competitively appointed [2] are as follows:

1. Examples of qualification standards are attached as exhibits to the August 25, 1981 Affidavit of Richard T. Seymour.

2. The Fiscal year 1975 statistics (which include statistics for PACE applicants from July 1974 through June 1975) need not be included. *First*, the class is defined to include only those blacks and Hispanics who have taken the PACE for hire into entry-level PACE jobs at any time on or after May 19, 1975. Thus, only a very minor portion of the Fiscal year 1975 statistics would be applicable to the class as

defined. *Second*, included within the Fiscal year 1975 statistics are also those positions which were filled on the basis of the former Federal Service Entrance Examination (FSEE), which is not at issue in this lawsuit. Thus, since the Fiscal Year 1975 statistics cannot be apportioned between selections made on the basis of hires from the PACE and from the FSEE, and would in any event constitute only a minor proportion of the relevant statistics for the class as defined, the Court finds that these statistics may be excluded.

| | Applicants Who Took the PACE Examination | Total Number of Competitive Hires |
|---|---|---|
| Fiscal Year 1976 | 222,340 | 8,254 |
| Fiscal Year 1977 | 185,691 | 8,521 |
| Fiscal Year 1978 | 135,403 | 7,687 |
| Fiscal Year 1979 | 112,323 | 6,283 |
| Fiscal Year 1980 | 67,806 | 4,674 |
| TOTAL | 723,563 | 35,419 · |

(June 17, 1981 Affidavit of James S. Green, Deputy Associate General Counsel of OPM, ¶ 3). Thus, for the years 1976 through 1980, only 4.9% of the applicants who took the PACE were actually selected for PACE occupations.

9. With the exception of the data collected during the January and April 1978 and the April 1980 administrations of the PACE, OPM did not collect and maintain information concerning the race and national origin of PACE applicants. (July 17, 1981 Affidavit of Donald Holum, ¶ 3). The data collected from a sample of PACE applicants during the January 1978 administration of the PACE, and from all PACE applicants during the April 1978 administration of the PACE, indicate that 10.9% of PACE applicants were black, while 5.8% of PACE applicants were Hispanic. Defendant's Response to Plaintiffs' Rule 36 Request for Admissions, No. 8. Analysis of the race and national origin data collected during the April 1980 administration of the PACE has not to date been completed (Holum Affidavit, ¶ 3).

10. Data collected by OPM from a sample of test-takers from the January, 1978 administration of the PACE and from all test-takers during the April, 1978 administration show as follows:

| | Whites | Blacks | Hispanics |
|---|---|---|---|
| Total number taking the PACE | 45,539 | 6,488 | 2,694 |
| Number achieving unaugmented score of 70 or above ----% of total | 19,177 42.1% | 323 5.0% | 347 12.9% |
| Number achieving augmented score of 70 or above ----% of total | 21,343 46.9% | 940 14.5% | 518 19.2% |
| Number achieving unaugmented score of 90 or above ----% of total | 3,861 8.5% | 17 0.3% | 40 1.5% |
| Number achieving augmented score of 90 or above ----% of total | 6,030 13.2% | 42 0.6% | 69 2.6% |

Defendant's Responses to Plaintiffs' Rule 36 Request for Admissions, No. 8.

11. Based upon the total number of individuals who took the PACE (Finding No. 8) and the proportion of those individuals which OPM records indicated were black and Hispanic (Finding No. 9), the class could include well over 100,000 members.

C. *History of the Litigation and Settlement Negotiations Between the Parties*

12. The parties in this lawsuit began settlement discussions a few months after the Complaint in this lawsuit was filed on January 29, 1979. Because of these settlement negotiations, the defendants moved on four occasions, without objection by plaintiffs, for extensions of time in which to respond to the Complaint. Defendants' answer was filed on December 14, 1979. At a status conference on January 29, 1980, the parties advised the Court that as a result of a three-day negotiation session in which all counsel of record had participated, the parties had reached a conceptual framework for the settlement of this lawsuit. At numerous status conferences during the ensuing months, the parties reported on the progress of their negotiations conducted during innumerable, sometimes daily, meetings of counsel for both sides. On September 23, 1980, the Court ordered the parties

to make offers and counteroffers, as appropriate, and to meet for further negotiations by certain specified dates.

13. Although settlement negotiations were going on, the parties continued litigating the case. Plaintiffs have filed requests for admissions, requests for production of documents, and propounded several sets of interrogatories to defendants. On August 15, 1980, the parties agreed to amend the complaint in order to add an additional named plaintiff to this lawsuit. Plaintiffs moved for class certification on September 29, 1980. The defendants filed their opposition on October 17, 1980.

14. On October 23, 1980, the Court requested the parties to determine the time frame within which the parties would complete discovery, and to estimate the duration of the trial, including the number of witnesses each party intended to call. On November 12, 1980, the Court granted plaintiffs' Motion for Class Certification. The Court also ordered that discovery be completed by May 22, 1981, and set the trial date for June 22, 1981.

15. After two years of negotiations, the parties reached an agreement and jointly moved on January 9, 1981 for an order granting preliminary approval to a Consent Decree and for the purpose of providing notice of the settlement to the class members. This motion was granted by the Court on January 15, 1981. After further negotiations between the parties which resulted in several amendments to the Consent Decree, the parties on February 24, 1981, jointly moved to amend the Consent Decree, requesting the Court to grant preliminary approval to the Decree as amended and to authorize the parties to provide notice to class members of the proposed settlement. The Court granted the motion on February 26, 1981. The Court was kept

sufficiently apprised of the course of negotiations over this period of time to be satisfied that the Consent Decree was the product of negotiations conducted entirely at arm's length.

### D. *Notice to Class Members*

16. The notice sent to class members, as well as the methods of its dissemination, were contained in the Orders of January 15, 1981 and February 26, 1981 (and as amended by the Order of May 5, 1981). OPM did not have available any records concerning the racial identity or national origin of individuals who took the PACE, except for the January 1978 administration, when racial and national origin data were collected from a sample of test-takers, and in April 1978, when such information was collected from all test-takers. (Holum Aff., ¶ 3).[3]

17. Some class members for whom 1978 racial and national origin data were maintained subsequently became Federal employees through means other than the PACE. By cross-checking their names with lists of current Federal employees, it was possible to locate approximately 1600 class members at their last known Federal worksites. Defendants were therefore able to send these class members by way of their servicing personnel office the detailed notice contained at Appendix B to the Order of February 26, 1981. (Green Aff., ¶ 8).

18. For the remainder of the class members, notice was provided through the various methods of dissemination detailed in the orders of January 15, 1981, and February 26, 1981. Defendants incurred costs of $253,791.16 in having the notice attached as Appendix A appear once a week for four consecutive weeks in 113 newspapers in 70 major cities, as well as in four magazines which have predominantly black or Hispanic readerships. (July 17, 1981 Affidavit of Barbara Louise Ward, Exhibit 1 to Ward

---

**3.** Race and national origin data were collected from PACE applicants in the spring of 1980. The forms containing the race and national origin data of applicants did not, however, contain the address of the applicants. To attempt to match the race and national origin data with other information showing the addresses of applicants, in order to give personal notice to

those class members, would have required OPM to place this information in a computer readable format. Defendants have advised the Court that this could not have been timely accomplished given the time constraints for providing notice to class members (Holum Aff., ¶ 3).

Affidavit). Moreover, OPM Regional Directors were instructed to disseminate copies of the notice to the Area Offices and to OPM Job Information centers within their jurisdictions. All of these OPM offices were instructed to post the notice attached as Appendix A to the Order of February 20, 1980 in an area accessible to the public, to allow review of the Consent Decree when requested by a member of the public, and to give a copy of the detailed notice attached as Appendix B to any member of the public requesting it. (Green Aff., ¶ 3).

19. OPM Regional Directors and Area Office Managers were requested to disseminate the detailed notice contained at Appendix B to the Order of February 26, 1980 with appropriate cover letters, to the 729 minority-oriented radio and television stations set forth in Appendix C to the Order of January 15, 1981, as well as to the minority organizations listed in Appendix E to the Order of January 15, 1981. (Green Aff., ¶ 4). Regional Directors were also requested to disseminate copies of the detailed notice and copies of the proposed Decree to minority organizations known to OPM through local and regional equal employment opportunity programs. (Green Aff., ¶ 6).

20. All OPM offices were instructed that any inquiry regarding interpretation of the Decree should be directed to the Office of the General Counsel of OPM. Approximately fifty (50) telephone inquiries from class members were directed to Mr. James Green, the Deputy Associate General Counsel of OPM. In several instances, members of the public spoke to Mr. Green by telephone at government expense. (Green Aff., ¶ 5). Where requested, copies of the Decree and/or Appendix B were mailed to these class members. In addition, approximately eight hundred (800) written inquiries for further information regarding the case were received in the Office of General Counsel of OPM. Copies of Appendix B were mailed to all of these class members. (Green Aff., ¶ 7).

E. *Objections By Class Members To The Final Entry of The Consent Decree*

21. In response to the notice provided by defendants, more than four hundred statements from class members were received by the Clerk of the court on or before May 1, 1981, the deadline established by the Order of February 26, 1981 for receiving objections from class members. The Court has had the opportunity to review these statements.

22. Of the more than 400 statements received from class members, 77 were identified and determined by counsel on both sides to be clear objections to the Consent Decree. (May 26, 1981 List of Class Members Who Filed Timely Objections.) Each of these class members was sent a copy of the more detailed form of Notice attached as Appendix B to the Order of February 26, 1981. Three of these class members then wrote to counsel for plaintiffs stating that they either had not intended to object to the settlement, or that they now withdrew their objections. (June 15, 1981 List of Class Members Who Have Withdrawn Their Objections, and List of Class Members Who Have Clarified the Statements They Originally Filed With the Clerk, at 2). The Court excused the late filing of another clear objection made by Rosa O. Brooks, bringing the total up to 75.

23. The remaining 333 class members who had filed statements which were ambiguous as to their intention to object to the settlement were sent the more detailed Appendix B notice, as well as a letter advising them that they would have an additional opportunity to make a proper objection by filling out an enclosed form for clarification of their statements. They were informed that if they did not submit a timely clarification, they would be deemed to have waived their opportunity to make any objection. 163 of these class members did not file timely clarification forms indicating their objections. The Court finds that these class members do not therefore object to the settlement, or have waived any objection to the settlement.

24. Of the 169 class members who responded by supplemental statements on their clarification forms, 97 (or 57.4%) indicated that they wished to see the settlement put into effect, while 68 (or 40.2%) indicated that they objected to the Consent Decree.[4] Ten additional class members, who contend that they have pending administrative or judicial claims of discrimination against the PACE and who claim they are therefore entitled, under ¶ 21 of the Consent Decree, to $3,000 in liquidated monetary relief and to assistance in finding a Federal job, filed conditional objections in the event that they are ultimately held not to be entitled to such relief.

25. Thus, 153 of the estimated 100,000 class members, or 0.153% of the total estimated number of class members (Finding No. 11), have advised the Court that they object to the final entry of the Consent Decree. These class members comprise roughly one-sixth of one per cent of the approximately 100,000 class members.

26. The objections received by the Clerk fall primarily into the eight following categories: (1) the adequacy of the notice of the settlement to class members; (2) the failure of the settlement to provide relief for individuals who have taken the PACE not for competitive entry-level hiring, but for promotions; (3) the failure of the Consent Decree to provide for the immediate elimination of the PACE; (4) the adverse effect of the elimination of the PACE upon class members who have passed the PACE and whose names are currently on OPM's PACE register; (5) the possibility that the alternative examining procedures to be developed under the Consent Decree will be biased; (6) the "all practicable efforts" obligation and other obligations of the Consent Decree are too subjective to be properly enforced; (7) all class members should be entitled to backpay and assistance in finding Federal employment even though they had not filed a judicial or administrative charge of discrimination concerning the PACE; and (8)

class members who had relied upon the existence of the *Luevano* class action lawsuit in refraining from filing their own administrative or judicial claims against the PACE should also be entitled to backpay and assistance in finding a Federal job.

27. With the exception of those class members who claimed to have relied on the existence of the *Luevano* class action in refraining from filing their own claims of discrimination against the PACE, those members who objected to the final entry of the Decree were not required to appear before the Court in order to have their objections considered. (*See* the Order of May 19, 1981). These class members were nonetheless provided the opportunity to express their objections personally to the Court during two fairness hearings held on May 27 and June 16, 1981. Some class members were allowed to testify even though they had not properly filed objections with the Clerk of the Court.

F. *Terms Of The Consent Decree*

28. No later than three years after the effective date of this Decree, use of the PACE will be eliminated. In its place, OPM or a defendant agency will develop an examining procedure designed to examine for a particular job category or group of job categories. (Decree, ¶ 13(a)). The elimination of the PACE will be accomplished in accordance with the following schedule:

| Date | Minimum Percentages of Appointments Under Alternative Examining Procedures For Jobs Which Had Been Subject to the PACE Requirement As of January 1, 1979 |
| --- | --- |
| One year after effective date of Decree | 50% |
| Two years after effective date of Decree | 80% |
| Three years after effective date of Decree | 100% |

(Decree, ¶ 13(a)).

29. During the three years while the PACE is being phased out, OPM has agreed

---

4. These figures reflect the deletion of Rosa Brooks' objection from the responses made on clarification forms where her objection had been incorrectly placed on the June 15, 1981 list. The figures do not add up to 100% because some class members submitted blank clarification forms.

to establish a program to provide assistance to applicants in preparing to take the PACE, at no cost to them, exclusive of transportation and subsistence costs. (Decree, ¶ 16(d)). This program, which is to be administered in selected areas of high black and Hispanic concentration, will be primarily for the benefit of class members. (Decree, ¶ 16(d)).

30. During the three years while the PACE is being phased out, OPM and the defendant agencies will have the discretion under the above schedule to continue to use the PACE register to consider candidates for PACE occupations where no alternative examining procedure has been developed for that occupation. (Decree, ¶ 16; Finding No. 5). Thus those class members who have passed the PACE and whose names are included on the PACE register will have the opportunity to be referred to any employing agency for consideration for a particular remaining PACE occupation. (Decree, ¶ 16). In addition, these class members are free to take the alternative examining procedures which have been developed, or may be considered for employment through the special programs described below, thereby enabling them, if otherwise eligible, to avail themselves of the opportunity to be considered for vacancies in all PACE occupations.

31. So long as there has been no alternative examining procedure implemented for a PACE occupation, the agency which chooses to make selections for the occupation by use of the PACE register will be obligated to use "all practicable efforts" to eliminate any adverse impact against class members which may result from its use. Use of "all practicable efforts" includes, but is not limited to, recruiting efforts and the use to the greatest extent feasible of special programs established by the Decree. (Decree, ¶ 9(f)). These programs include (a) the Outstanding Scholar program under which college graduates with grade point averages of 3.5 or higher, or who stand in the upper 10% of their graduating class, need not take PACE or any new examining procedures in order to be hired by the agency (Decree, ¶ 16(a)); (b) the bilingual and/or bicultural program, under which applicants who have passed the PACE or an alternative examining procedure and who possess bilingual and/or bicultural skills will be referred in rank order ahead of applicants who lack these necessary skills if the agencies determine that an individual's performance in a PACE occupation would be enhanced by such skills (Decree, ¶ 16(b); and (c) the College Co-op and other work study programs, in which student participants who successfully complete the program may be non-competitively converted to PACE jobs without taking the PACE or a replacement examining procedure developed pursuant to the Consent Decree (Decree, ¶ 16(c)). The College Co-op program as used by the Department of Defense may continue so long as that method of use is required by other provisions of law.

32. Some class members have objected to the settlement on the grounds that the PACE should be eliminated immediately. However, the immediate replacement of the PACE with new examining procedures for the over 100 occupations still under PACE would be very difficult and quite costly. (Outtz Deposition, Tr. 10–11; July 17, 1981 Affidavit of Richard B. Post, ¶¶ 3, 7). To develop alternative examining procedures for these PACE occupations which would be consistent with the professional and legal requirements imposed upon all Federal hiring examinations would require a substantial period of time. Each replacement examination must undergo a careful technical development process which will require extensive professional staff, time and expense. (Outtz Deposition, Tr. 11–12; Post Aff., ¶¶ 3–4).

33. It must be noted that, during the course of this development process, defendants have agreed to provide plaintiffs with summaries of their plans for developing and validating the new procedures, to respond to any other reasonable requests by plaintiffs for information, and to consider any comments which plaintiffs may offer concerning the examination procedures. (Decree, ¶ 26). Thus, the phased-in examination development process will also offer an

opportunity for comments by the plaintiffs which may be useful in the development of examining procedures which will be valid, as that term has been defined in the Decree. (Outtz deposition, Tr. 12–13).

34. Moreover, even after a new examination has been developed, these new examining procedures must be disseminated to OPM or agency offices around the nation in order to make these examinations operational. New vacancy announcements, applications and other necessary forms, and procedures for processing applicants, must be developed. This often involves extensive drafting and printing requirements as well as distribution considerations. The OPM or agency staff must be instructed on the operational aspects of implementing and scoring the new procedures. The development process also must include instructions on the actual processing of applications and the development of new registers of eligible applicants. Much of that work must be done manually due to limited automatic data processing capabilities. (Post Aff., ¶¶ 5–6).

■ 35. The Court finds, therefore, that the above schedule for the elimination of the PACE, and the phased-in development and implementation process for the new examining procedures, with the attendant protection afforded class members by the training program and the use by defendants of "all practicable efforts" to eliminate adverse impact during this interim period, is a reasonable course of action by the parties. (Post Aff., ¶ 7; Outtz deposition, Tr. 10–15).

36. The parties have agreed, and the Court finds, that the purpose of the Decree is to provide, in accord with the underlying policies of Title VII and the Civil Service Reform Act of 1978, for the elimination of the PACE, and for the development of alternative examining procedures which will eliminate adverse impact against blacks and Hispanics as much as feasible, and which will validly and fairly test the relative capacity of applicants to perform PACE occu-

pations. (Decree, ¶ 2(b)).[5] Pursuant to this objective, the defendants have agreed that as part of any validity study supporting the use of an examining procedure, the agency will consider other available examining procedures which would satisfy the agency's need for efficiency and productivity by fairly and validly testing the relative capacity and fitness of applicants to perform on the job, and which would have no adverse impact against blacks or Hispanics, or lesser adverse impact than the procedure(s) primarily being studied. If such a procedure is available, defendants have agreed to adopt the selection procedure that results in the least adverse impact while continuing to meet agency needs. (Decree, ¶ 12(i)). Plaintiffs will have the opportunity to provide their comments during this process. (Finding No. 33; Decree, ¶ 26).

37. Thus, the Court finds that the development of separate examining procedures designed to examine for a particular job category or categories may result in a reduction in adverse impact against blacks and Hispanics compared to that which resulted from the PACE. (Decree, ¶ 12(i); Outtz deposition Tr. 13–15). To the extent that there is such a reduction in adverse impact against class members, the increase in earnings attendant to their hire in PACE occupations would constitute a major benefit for the class.

38. However, if during the term of the Decree an alternative examining procedure results in adverse impact against blacks or against Hispanics, the government has agreed that it will use "all practicable efforts", through the use of the special programs described above (Finding No. 31), to eliminate any such adverse impact in its selections for a given job category. (Decree, ¶ 12(c)). The term of the Decree will be for five years after the implementation of a replacement alternative examining procedure or procedures for a PACE job category or group of job categories. (Decree, ¶ 7). At any time three years after

---

5. Of course, an enforcement proceeding under the Consent Decree may be brought against an alternative examining procedure only if it has a disproportionately adverse effect against blacks or against Hispanics. (Consent Decree, ¶¶ 17–18).

the effective date of the Decree, an agency may cease its "all practicable efforts" obligation when (1) the replacement examining procedure or procedures have been used for actual hiring for the job category in question for at least a two-year period; and (2) the agency has adequate evidence of the relative impact of the procedure upon blacks and upon Hispanics as compared with non-Hispanic whites. If an agency elects to cease "all practicable efforts" to eliminate adverse impact resulting from the replacement examining procedure, the agency would be liable for full relief under Title VII if the Court determines that the procedure was not properly validated, as that term has been defined in the Consent Decree.

39. Moreover, the Consent Decree provides for recordkeeping requirements to enable plaintiffs to determine whether adverse impact against class members results from use of the PACE or the alternative examining procedures. (Decree, ¶¶ 24–25). Defendants have also agreed to provide plaintiffs with detailed statements describing their efforts to maximize their use of the special programs established in the Consent Decree. (Decree, ¶ 24(c)). This Court will receive reports as to the defendants' compliance with the Consent Decree. (Decree, ¶ 7). Plaintiffs would be entitled under the Consent Decree to reasonable attorneys' fees for their services in monitoring the Decree. (Decree, ¶ 32). If plaintiffs allege that such procedures are not valid and the parties are unable to resolve this issue informally, the Decree provides for judicial resolution of this issue in enforcement proceedings before the Court (Decree, ¶ 17) without the need for plaintiffs first to exhaust administrative remedies as otherwise required by Title VII. Plaintiffs will be entitled to reimbursement of their reasonable attorneys' fees in the event they prevail before the Court. (Decree, ¶ 33). The Court finds, therefore, that the recordkeeping requirements and the enforcement mechanism set forth in the Decree will be fully adequate to ensure that the obligations assumed by defendants under the Consent Decree are properly implemented.

40. The Consent Decree provides for $35,000 in monetary relief to be allocated among the four named plaintiffs, as well as for the referral of two of these plaintiffs to agencies for specific PACE occupations in which they have indicated an interest and for which they are qualified. (Decree, ¶ 20). This is far less than the maximum aggregate loss of earnings which they would have claimed if the PACE had been judicially determined to be unlawful and they had been determined to be entitled to backpay.[6] Any unnamed class members who have filed timely administrative charges of discrimination against the PACE and whose charges are still pending in the administrative or judicial process will be entitled to $3,000 as well as to assistance in finding suitable Federal employment in full settlement of their outstanding claims. (Decree, ¶ 21). A number of class members have brought themselves to the attention of the Court as claimants for the relief provided in ¶ 21 of the Consent Decree, and their claims are being investigated by counsel. (*See* the Order of June 8, 1981).

41. Some class members have objected to the Consent Decree on the grounds that all class members should be entitled to back pay and to assistance in obtaining Federal employment even though they had not filed an independent administrative complaint of discrimination concerning the PACE, as provided by the Consent Decree. The Court does not find this objection persuasive. As set forth above, for the period of time relevant to this litigation, only 4.9% of all applicants who took the PACE were actually appointed to PACE occupations. (Finding No. 8). In other words, over 95% of all PACE applicants were not selected for PACE positions. (Outtz deposition, Tr. 23). Thus, even if the PACE had not had any adverse impact

---

6. Attached to Mr. Seymour's affidavit is a calculation showing that for just two of the four plaintiffs, their monetary relief would be $117,- 506.75 through the period of retention of jurisdiction if all issues were resolved in their favor.

against blacks or against Hispanics, it could be expected as a statistical matter that 95% of all white PACE applicants, 95% of all black PACE applicants, as well as 95% of all Hispanic applicants, would not have been hired for any PACE occupations. (Outtz deposition, Tr. 23–24).

42. Thus, if the PACE had not had any adverse impact against blacks and Hispanics, it could be expected as a statistical matter that, at most, 4.9% of the estimated 100,000 class members, or approximately 4,900 black and Hispanic PACE applicants, would have been hired for PACE positions. If this lawsuit had gone to trial and use of the PACE had been finally determined to be unlawful, only 4,900 class members, to the extent they could have been identified, would then have been entitled to claim backpay and/or Federal employment. Conversely, 95% of the estimated 100,000 class members, or approximately 95,000 black and Hispanic PACE applicants, would not have been hired for PACE positions even if there had been no adverse impact from the PACE. To the extent that the class members who would have been hired for PACE occupations could be identified, 95,000 class members would not have had any claim of entitlement to backpay and/or Federal employment, even if the PACE had been determined to be unlawful.

43. If the PACE had been judicially determined to be unlawful during the liability phase of this litigation, the process of identifying which 4,900 of the estimated 100,000 class members would be entitled to individual relief would have been an immensely time-consuming and expensive process. (Outtz deposition, Tr. 26–32). This process would have been further complicated by the fact that applicants under the PACE system did not apply for a specific occupation out of the 118 occupations for which the PACE was used as an examining device, but applied only for broad types of jobs. Those PACE applicants who passed the PACE were simply entitled to have their names placed on the register in score order, to be considered by agencies as agency needs dictated that they filled any of the 118 PACE occupations. Finding Nos. 4–7.

Moreover, since there are a number of other factors beyond the applicant's rating which may be considered by OPM or by the hiring agency in filling vacancies in PACE occupations, even applicants with high ratings had no assurance of selection for or appointment to a PACE position. Finding No. 7. Thus, even after undergoing the time-consuming and expensive process of attempting to determine which 5% of the 100,000 class members would have a claim for backpay and/or Federal employment, there exists the prospect that the results would have been inaccurate.

44. The implementation of any backpay formula which attempted to identify that part of the class who would most likely have received jobs in the absence of any adverse impact from the PACE would involve the same kinds of factors and qualifications as those discussed in Finding No. 43, and would therefore also involve a time-consuming and complex resolution process fraught with similar prospects of inaccuracy.

45. Under these circumstances, and in light of the significant injunctive relief afforded all class members by the Consent Decree, the Court finds that the failure of the Decree to provide backpay and assistance in finding suitable Federal employment to all class members was a reasonable compromise by the parties.

G. *Class Members Who Allegedly Relied Upon the Luevano Class Action And Did Not Therefore File Claims Against the PACE*

46. The Consent Decree provides that any unnamed class members who have filed timely claims of discrimination against the PACE and whose charges are still pending in the administrative or judicial process will be entitled to $3,000 as well as assistance in finding suitable Federal employment in full settlement of their outstanding claims. (Decree, ¶ 21). Six class members (Anthony Baird, Sharon Hargrove, Sandra Newhill, Iris Rogers, Cynthia Sheppard and John Sheppard) have filed written statements with the Clerk of the Court objecting

to the Consent Decree on the grounds that they had relied on the *Luevano* class action in refraining from filing their own discrimination claims against the PACE. These class members maintain that they should also be entitled to obtain backpay and assistance in finding Federal employment.

47. Five class members (Anthony Baird, Sharon Hargrove, Sandra Newhill, Iris Rogers, and John Sheppard) raising this objection reside in Baltimore, Maryland or Washington, D. C. All five were advised by a supplemental notification sent pursuant to the Order of May 19, 1981, that they must attend the May 27 fairness hearing or they would waive their objections. Sandra Newhill did not appear to testify at the May 27 hearing and the Court finds, therefore, that she has waived her objections to the Consent Decree. Cynthia Sheppard was not required to attend the May 27 fairness hearing because she resides in Los Angeles, California. However, since she indicated that she wished to have the opportunity to testify and pursue her claim, counsel for the parties deposed Ms. Sheppard in Los Angeles, California on June 2, 1981.

48. Anthony Baird, a 29-year-old black male, testified at the May 27 hearing that he took the PACE on one occasion, which was sometime in 1975. (Transcript of May 27, 1981 Fairness Hearing (hereinafter "May 27 Tr."), p. 102). Mr. Baird recalls that he passed the PACE and received a rating of 72 or 73 on the exam. Although Mr. Baird did not recall precisely when he first became aware of the *Luevano* class action, he recalled that it was possibly as a result of an article concerning this lawsuit published in the Washington *Post* during May of 1980, or from announcements concerning this lawsuit on the radio or television. (May 27 Tr. 106, 109–110). After Mr. Baird received notice of the settlement as a result of the court-ordered notice, he filed an objection by letter dated April 27, 1981. Mr. Baird testified that he was assisted in the preparation of his objection by a friend who was then a student at the University of Baltimore Law School. (May 27 Tr. 107). Mr. Baird also testified that he had shown a copy of his objection to Iris Rogers, who

subsequently filed a substantially similar objection which she had written in his presence. (May 27 Tr. 105, 114, 116). Since Mr. Baird did not become aware of the *Luevano* lawsuit or its status as a class action until May 1980 at the earliest, the Court finds that Mr. Baird could not possibly have relied on the pendency of this class action prior to May 1980 in failing to file his own discrimination claim against the PACE. By then, his time to file his own complaint of discrimination had long expired. 29 C.F.R. § 713.214; 5 C.F.R. § 300.

49. Iris Rogers, a 33 year-old black female, testified at the May 27 hearing that she took the PACE during the fall of 1975 and failed to obtain a passing score. (May 27 Tr. 119). She has never been employed by the Federal government. (May 27 Tr. 118). Ms. Rogers testified that she first heard about the *Luevano* class action in April 1981 (May 27 Tr. 120) as a result of the court-ordered notice to class members. (May 27 Tr. 127). Ms. Rogers testified that she first discussed filing an objection with Anthony Baird, with whom she worked at the Department of Social Services in Maryland (May 27 Tr. 123) and who filed a similar objection to the Consent Decree. (*See* Finding No. 48). Mr. Baird had also shown to her a rough draft of the letter that he was intending to file as an objection to the Consent Decree. (May 27 Tr. 124). Ms. Rogers also testified that aside from filing her objection to the Consent Decree, the existence of the *Luevano* class action did not lead her to take any action or fail to take any action, including the filing of her own discrimination complaint against the PACE. (May 27 Tr. 128). The Court finds therefore that she did not rely upon the pendency of the *Luevano* class action in failing to file her discrimination claim against the PACE.

50. Sharon Hargrove, a 29 year-old black woman, testified at the May 27 hearing that she took the PACE in the fall of 1975, and failed to obtain a passing score. (May 27 Tr. 135). With the exception of several summer jobs and some temporary work, Ms. Hargrove has not been employed

by the Federal government. (May 27 Tr. 133). Ms. Hargrove first heard of this lawsuit as a result of the notice to class members published in the Baltimore *News American* pursuant to the court-ordered notice to class members. In drafting her objection to the Consent Decree, Ms. Hargrove consulted with Iris Rogers, a co-worker at the Department of Social Services in Maryland, who has also filed an objection to the Consent Decree. (*See* Finding No. 49). The objections filed by Ms. Hargrove and Ms. Rogers were totally identical in their form and content. Ms. Hargrove testified that aside from filing her objection to the Consent Decree, the existence of the *Luevano* class action did not lead her to do anything or to fail to do anything, including the filing of a discrimination complaint against the PACE. (May 27 Tr. 142). Indeed, one aspect of her complaint, as she testified on May 27, was that the existence of the lawsuit had not been brought to her attention until the Notice to Class Members had been published. The Court finds therefore that she did not rely upon the pendency of the *Luevano* class action in failing to file a discrimination claim against the PACE.

51. John Sheppard, a 27 year old black male, testified that he took the PACE in the spring of 1977. (May 27 Tr. 151–152). Mr. Sheppard failed to obtain a passing score on the PACE. (May 27 Tr. 153). Mr. Sheppard testified that he first became aware of the *Luevano* class action as a result of an article concerning this lawsuit published in the Washington *Post* during the summer of 1980. (May 27 Tr. 154). Although he had considered filing a complaint against the PACE after the spring of 1977, he decided against it when he read in the Summer 1980 Washington *Post* article that this was a class action lawsuit. (May 27 Tr. 154, 156–157, 159). Mr. Sheppard also stated in paragraph 7 of his objection that "[w]e relied on the Court's determination that we would be adequately represented as members of the class, and postponed pursuing the matter on our own." At the May 27 hearing, Mr. Sheppard testified that he had read about this determina-

tion by the Court in the Summer 1980 Washington *Post* article (May 27 Tr. 167), an assertion which is obviously mistaken since the Court did not make any determinations concerning the propriety of class certification in this lawsuit until November 12, 1980 when the Court granted plaintiffs' Motion for Class Certification. In any event, Mr. Sheppard testified that from the time he took the PACE until he first became aware of the *Luevano* class action from the Washington *Post*, he did not take any action or fail to take any action because of the *Luevano* lawsuit, aside from discussing the PACE with some friends and with his brother, who was then a law student. (May 27 Tr. 162). The Court finds therefore that Mr. Sheppard could not possibly have relied on the pendency of this class action prior to May 1980 in failing to file his own discrimination claims against the PACE.

52. Cynthia Sheppard, a 28 year-old black woman who is the sister of John Sheppard, filed the same objection as her brother. (*See* Finding No. 51). Counsel for the parties deposed Ms. Sheppard on June 2, 1981 in Los Angeles, California, where she currently resides. Ms. Sheppard took the PACE in December of 1975 but did not obtain a passing score. (Sheppard deposition Tr. 10). She testified that after her brother John Sheppard took the PACE in 1977, they and some friends discussed their perception that the PACE was very difficult, and discussed filing a discrimination complaint, which they never pursued. (Sheppard deposition Tr. 15–19). Ms. Sheppard first heard about the *Luevano* class action in the late Summer of 1980 from her discussion with her brother and some friends. (Sheppard deposition Tr. 15, 24). Ms. Sheppard testified that when she first heard about the *Luevano* lawsuit, she then decided to file a discrimination claim against the PACE, but then decided that it was unnecessary since she was a member of the *Luevano* class action. (Sheppard deposition Tr. 19). Ms. Sheppard testified that aside from filing her objection, she did nothing as a result of the lawsuit. (Shep-

pard deposition Tr. 25). She also testified that had she known that she would not receive any backpay or assistance in finding Federal employment as a result of this settlement, she would have filed her own discrimination claim against the PACE during the spring of 1977 when she first discussed the PACE with her brother. (Sheppard deposition Tr. 25–26, 40). However, since she did not become aware of the *Luevano* class action until late Summer of 1980, she obviously did not rely upon the pendency of this lawsuit in her failure to file her own claim anytime prior to that time.

II. *Conclusions of Law*

1. There is a strong public policy in favor of the settlement of claims. The Supreme Court has recently held that this policy is particularly important in the resolution of cases brought under Title VII of the Civil Rights Act of 1964, because of the "strong preference" of Congress for "encouraging voluntary settlement of employment discrimination claims." *Carson v. American Brands*, 450 U.S. 79, 88 n.14, 101 S.Ct. 993, 998 n.14, 67 L.Ed.2d 59, 67 n.14 (1981). Decisions emphasizing the preferred role of settlements under Title VII are legion. *E.g., Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974); *United States v. Trucking Employers*, 182 U.S.App.D.C. 315, 561 F.2d 313, 317 (D.C. Cir., 1977); *Patterson v. Newspaper & Mail Del. Union of N. Y.*, 514 F.2d 767, 771 (2nd Cir. 1975); *Flinn v. FMC Corp.*, 528 F.2d 1169, 1174 (4th Cir., 1975), *cert. den.*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976); *United States v. City of Miami*, 614 F.2d 1322, 1331 (5th Cir., 1980), *rehearing en banc granted*, 625 F.2d 1310 ("extremely high premium put by Congress on voluntary settlement of Title VII suits"); *United States v. Allegheny-Ludlum Industries*, 517 F.2d 826, 846–48 (5th Cir. 1975), *cert. den.*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976); *EEOC v. Safeway Stores*, 611 F.2d 795, 799 (10th Cir. 1979), *cert. den.*, 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 809 (1980).

2. Because the class herein has been certified under Rule 23(b)(2), F.R. Civ.P., and the settlement will be binding on class members, the Court has a fiduciary obligation to the class in evaluating the fairness and overall adequacy of the relief provided in the settlement. *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir.), *cert. den.*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *Greenfield v. Villager Industries*, 483 F.2d 824, 832 (3rd Cir. 1973); *Zients v. LaMorte*, 569 F.2d 628, 630 (2nd Cir. 1972).

3. Because of the binding effect of the settlement of a Rule 23(b)(2) class action on the members of the class, due process requires that class members be given the "best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950); *Mandujano v. Basic Vegetable Products*, 541 F.2d 832, 835 (9th Cir. 1976); *Greenfield, supra*. The notice provided to class members herein meets the standards of due process and of Rule 23(e), F.R.Civ.P. *Mendoza v. United States*, 623 F.2d 1338, 1350 (9th Cir. 1980), *cert. den., Sanchez v. Tucson Unified School District*, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981).

4. Samuel Wallace, a class member, has objected that notice of the pendency of this case should have been provided to class members after the filing of the Complaint, in advance of any determination that the case could proceed as a class action, and before any settlement. Under no circumstances does Rule 23 require that notice be given before a class has been certified, and in a class action certified under Rule 23(b)(2), no notice need be given prior to a settlement. Accordingly, the objection is overruled.

5. In the absence of agreement by the parties, a class member is not allowed to opt out of a class action brought under Rule 23(b)(2). *Kincade v. General Tire & Rubber Co.*, 635 F.2d 501, 506–08

(5th Cir. 1981); *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1220 (5th Cir. 1978), *cert. den.*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). *Cf. Van Gemert v. Boeing Co.*, 590 F.2d 433, 438 n. 11 (2nd Cir. 1978) (*en banc*), *aff'd*, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980), (holding that no class member may opt out of a Rule 23(b)(1) class action). The Consent Decree imposes substantial obligations on the government, and establishes a comprehensive scheme for monitoring the government's compliance with these obligations and for resolving any disputes as to compliance. The interest of the defendants in avoiding future litigation over use of the PACE for competitive hiring by settling this lawsuit, and the interest of both plaintiffs and defendants in eliminating any danger of conflicting remedial orders arising from the prosecution of other cases by class members, is a reasonable and proper basis for the provisions of the Consent Decree binding all class members to the relief provided by the settlement.

■ 6. It is the task of this Court to determine the overall fairness of the settlement to class members, and its consistency with the public interest. *United States v. Trucking Employers*, 561 F.2d at 317. All relief provided to the class must be examined, not just the provisions of the settlement with regard to monetary relief. 561 F.2d at 317–18 and 318 n.16. *Accord, United States v. Allegheny-Ludlum Industries*, 517 F.2d at 864.

■ 7. In evaluating the overall adequacy of the relief provided to the class, it is not the function of this Court to try the issue of discrimination on its merits. A settlement necessarily involves a compromise in which each side has given up some things which it might have obtained if the case had been litigated, and thereby avoids the risk that litigation might have resulted in its losing even more. In *Carson v. American Brands,* the Court stated:

> Courts judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered

in the settlement. . . . They do not decide the merits of the case or resolve unsettled legal questions.

450 U.S. at 88 n.14, 101 S.Ct. at 998 n.14, 67 L.Ed.2d at 67 n.14.

■ 8. The assessments by the parties of their respective risks of litigation herein were based on the formal and informal discovery obtained in this action, as well as on the information obtained in two prior lawsuits involving the PACE or its predecessor, the Federal Service Entrance Examination ("FSEE"). The first of these cases, *Douglas v. Hampton*, 338 F.Supp. 18 (D.D.C.), was filed by the Lawyers' Committee in 1971 to challenge the validity of the FSEE. The second case, *Ellis v. Naval Air Rework Facility*, 404 F.Supp. 377 (N.D.Cal.), was filed by the NAACP Legal Defense and Educational Fund and others in 1973 to challenge use of the FSEE and, subsequently, the PACE, as well as to challenge other practices. Several attorneys for the plaintiffs in *Ellis* are co-counsel for plaintiffs herein. In both *Douglas* and *Ellis,* substantial discovery was taken on the validation studies performed by the Civil Service Commission. In evaluating the fairness and adequacy of a settlement, it is important to consider whether the settlement was reached after extensive factual development, so that counsel on both sides would have had information sufficient to make a reasonable assessment of their risks of litigation. *Flinn v. FMC Corp.*, 528 F.2d at 1173; *Women's Committee v. Nat'l Broadcasting Co.*, 76 F.R.D. 173, 176 (S.D.N.Y., 1977). The fact that counsel for plaintiffs have been involved in similar litigation with the Civil Service Commission over the past ten years indicates that both sides were in an excellent position to assess the risks of litigation in this case.

9. It is clear from a review of the record herein that both sides faced a substantial risk of litigation. The primary focus of litigation at the liability stage of the case would have been the issue whether the PACE was properly validated under legal and professional standards. The Office of Personnel Management and its predecessor,

the Civil Service Commission, used a construct validity approach in its development and validation of the PACE. While such an approach is a relatively new method, it must be noted that the Supreme Court has also recognized in *Washington v. Davis*, 426 U.S. 229, 247 n.13, 96 S.Ct. 2040, 2051 n.13, 48 L.Ed.2d 597 (1976):

It appears beyond doubt by now that there is no single method for appropriately validating employment tests for their relationship to job performance. Professional standards developed by the American Psychological Association in its Standards for Educational and Psychological Tests and Manuals (1966), accept three basic methods of validation: "empirical" or "criterion" validity (demonstrated by identifying criteria that indicate successful job performance and then correlating test scores and the criteria so identified); "construct" validity (demonstrated by examinations structured to measure the degree to which job applicants have identifiable characteristics that have been determined to be important in successful job performance); and "content" validity (demonstrated by tests whose content closely approximates tasks to be performed on the job by the applicant).

Based on the present record, it is not possible to state that either side could have been completely confident of victory on this question. The settlement was thus reached at a time when both sides faced real risks of litigation.

■ 10. Where plaintiffs are confronted with all of the uncertainties inherent in litigation, it is proper for class counsel and the class representatives to compromise in their demands for relief in order to obtain substantial assured relief for the class. *Cf. United States v. Trucking Employers*, 561 F.2d at 317, noting the duty of a court under *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), to grant complete injunctive and monetary relief after a judicial determination of employment discrimination, and holding that a court asked to approve a consent decree in the absence of clear liability "is in a fundamentally different posi-

tion." *See also City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 (2nd Cir. 1974), holding that the burden of justifying a settlement providing only a small fraction of the relief potentially available would be much greater if a prior government action had established the defendants' *prima facie* liability.

■ 11. In this case, the relief provided for the class in this Consent Decree is quite substantial. One year after the effective date of the Consent Decree, half of the positions that would otherwise have been filled through use of the PACE will be filled through new alternative examining procedures designed to examine for a particular PACE occupation or group of occupations. The next year, the PACE will have been replaced for 80% of the positions filled in occupations subject to the PACE at the time suit was filed. Three years after the settlement goes into effect, use of the PACE for competitive hiring will be ended completely. The government's obligation to use all practicable efforts to eliminate adverse impact against blacks and Hispanics, combined with the use of new examining procedures meeting the goals set forth in paragraph 2 of the Consent Decree, may well result in suitably qualified blacks and Hispanics obtaining a large number of positions a year at the GS–5 and GS–7 levels. The use of new procedures which are validly related to job performance means that this gain for the class will not cause any reduction in the abilities of the persons actually hired or in the abilities of government agencies to discharge their functions.

12. Counsel for the parties have previously represented to the Court that it was not possible to reach an agreement for any settlement which did not include a waiver of classwide backpay. Plaintiffs had requested such relief in their Complaint, and the Court is satisfied that they have diligently pursued this claim for relief. Plaintiffs' counsel have advised the Court of their unanimous agreement that a waiver of classwide backpay is appropriate here, in

light of the expense the government will face in developing proper alternatives to the PACE, the degree of protection provided to the class by the Consent Decree with respect to the proper development of such alternatives, the importance to the class of bringing use of the PACE to a speedy end, the large number of additional jobs they expect the settlement to provide for the class, the difficulty of proving individual class members' entitlement to backpay in this case, and the risks of litigation. Counsel for plaintiffs, who include attorneys from a number of civil rights organizations, have substantial experience in the prosecution of Title VII cases.[7] Their professional judgment is not controlling, but is entitled to considerable weight in the Court's determination of the overall adequacy of the settlement. *Pettway*, 576 F.2d at 1216; *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977); *Flinn*, 528 F.2d at 1173; H. Newberg, *Newberg on Class Actions* § 5610d (1977).

13. A number of objecting class members oppose the settlement because it does not provide that all blacks and Hispanics who take the PACE will receive backpay. The records maintained by OPM indicate, however, that 58% of all white PACE applicants fail to achieve a passing score. Thus, even in the absence of any adverse impact against blacks and against Hispanics, it could be expected as a statistical matter that 58% of black and of Hispanic applicants would in any event have failed the PACE. Moreover, records maintained by OPM indicate that there were approximately 20 applicants for each vacancy in an occupation subject to the PACE requirement. Thus, approximately 95% of class members would never have been hired even,

if the scoring patterns of black, Hispanic and white PACE applicants had been identical. It is therefore clear that the vast majority of class members would not have been hired even in the absence of the PACE. Since Title VII "does not require a remedy for those not discriminated against," *Cotton v. Hinton*, 559 F.2d at 1334, or for those who have not been injured as a result of the discrimination *Day v. Mathews*, 174 U.S.App.D.C. 231, 530 F.2d 1083 (D.C. Cir. 1976), the Court finds no merit in the objection that all class members should receive backpay.

14. Even for those class members who would have been hired if the PACE had not had any adverse impact, it would be extremely difficult, and a very expensive and time-consuming process, to identify them, or even to establish a formula which would attempt to identify a group of class members who would have been likelier than others to have been hired in the absence of the PACE. This difficulty would be compounded greatly by the lack of government records identifying class members who took the PACE and recording their geographic preferences and availability, as well as the other considerations that might affect hiring decisions. (*See* Finding Nos. 7 and 16). While difficulty in determining backpay is generally not a permissible reason for denying it altogether in a litigated case, a totally indiscriminate formula approach would not be appropriate. *United States v. United States Steel Co.*, 520 F.2d 1043, 1052–53, 1056 (5th Cir. 1975), *clarified in other respects*, 525 F.2d 1214, *cert. den.*, 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976).

7. For example, the NAACP Legal Defense and Educational Fund represented the plaintiffs in the two Supreme Court cases most important to the determination of liability herein, *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and *Albemarle Paper*, both involving the obligation of a Title VII defendant to prove the job-relatedness of a selection procedure having a substantial racially disproportionate effect on members of a protected class. The Lawyers' Committee for Civil Rights Under Law represented plaintiffs in the two cases most important to the plaintiffs' procedural rights herein—*Chandler v. Roudebush*, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976), holding that Federal-sector Title VII plaintiffs have a right to a trial *de novo* and are not limited to review of the administrative record, and *Eastland v. Tennessee Valley Authority*, 553 F.2d 364 (5th Cir.), *cert. den.*, 434 U.S. 985, 98 S.Ct. 611, 54 L.Ed.2d 479 (1977), holding that Federal-sector Title VII plaintiffs have the same right as private-sector plaintiffs to bring broad class actions.

15. In assessing the adequacy of the overall settlement, it must also be borne in mind that relief might well be delayed for years if this case were to be litigated, even if plaintiffs prevailed. Given the magnitude of the burdens a remedial Decree would place on the government, relief might well be stayed pending an appeal. The processing of an appeal and a possible petition for certiorari might take an additional two or three years. There can be no certainty as to the number of future hires in PACE occupations, and the Consent Decree cannot be interpreted as requiring any minimum number of hires in these occupations. However, during the period of time in which a final judicial decision could have been reached in this litigation, it is possible that thousands of positions might have been filled by use of the PACE and many of these jobs might have been lost forever to blacks and to Hispanics.[8] A retroactive award of backpay for such additional harm would not be as beneficial to class members as the jobs which would be obtained if the Consent Decree were in effect. Even putting aside all consideration of the risks of litigation, the delay in providing relief to the class if this case were to be litigated is a factor strongly supporting the compromise reached by the parties. *United States v. City of Miami*, 614 F.2d at 1334 and 1334 n.23; *Allegheny-Ludlum*, 517 F.2d at 851. *Cf.* § 706(f)(5) of the Act, 42 U.S.C. § 2000e–5(f)(5), recognizing the public interest in the speedy provision of relief by requiring that a judge assigned to hear a Title VII case cause it "to be in every way expedited."

16. The four named plaintiffs herein are receiving an aggregate amount of $35,000 in monetary relief, and counsel for plaintiffs has represented that this is substantially less than their total economic loss. Where the named plaintiffs possess the same claims as class members but receive an increased measure of relief under a settlement, the Court must examine the settlement closely to ensure that the named plaintiffs have fairly represented the interests of the class. *Cf. Flinn*, 528 F.2d at 1174–76. Where there are sufficient indications that the class has been treated fairly and that the relief for the named plaintiffs is not excessive, the provision of greater monetary relief for the named plaintiffs than for class members does not warrant disapproval of the settlement. In *Lo Re v. Chase Manhattan Corp.*, 19 FEP Cases 1366, 1371 (S.D.N.Y., 1979), the court approved a settlement providing for the payment of $229,000 to the ten named plaintiffs,[9] although no class member would receive any backpay. The extent of the relief provided to the class (including injunctive relief and $500,000 in Promotion Incentive Payments for women promoted in the future) which was attained after arm's-length bargaining between the parties, and the low rate of objections to the decree, led the court to conclude that the settlement was fair and reasonable. In *Women's Committee*, 76 F.R.D. at 180–81, the court approved a settlement providing $540,000 in backpay to 2,700 class members and $170,000 in backpay to 16 named plaintiffs for these same reasons: the settlement provided significant relief to the class, there was no collusion in the case, and no objections to the settlement had been filed.[10]

---

8. Under Title VII, no employee may be "bumped" from his or her job in order to make that position available to a victim of discrimination. *Sledge v. J. P. Stevens & Co.*, 585 F.2d 625, 650–51 (4th Cir., 1978), *cert. den.*, 440 U.S. 981, 99 S.Ct. 1789, 60 L.Ed.2d 241 (1979); *Patterson v. American Tobacco Co.*, 535 F.2d 257, 267–68 (4th Cir.), *cert. den.*, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976); *Local 189, United Papermakers & Paperworkers v. United States*, 416 F.2d 980, 988 (5th Cir., 1969), *cert. den.*, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970).

9. An earlier decision made clear that there were ten named plaintiffs. 431 F.Supp. 189, 194 (S.D.N.Y., 1977).

10. In both cases, the courts emphasized that class members who had already filed their own charges of discrimination could continue to pursue their claims. Although class members who had filed their own administrative charges of discrimination against the PACE cannot continue to litigate their claims, they are entitled under the Decree to $3,000 in liquidated backpay, and assistance in finding suitable Federal employment, in full settlement of their claims.

17. For several reasons, the Court concludes that the provision of $35,000 in monetary relief to the named plaintiffs, while classwide backpay has been waived, should not defeat final approval of the settlement. *First*, it is clear that there was no improper collusion in this case. The Consent Decree is the product of twenty-three months of hard bargaining in which the parties developed a number of creative ways to safeguard the interests of the class in a manner avoiding conflict with the interests of the government. The Court was kept sufficiently apprised of the progress of settlement negotiations to be satisfied of their "arm's-length character." *Second*, only a sixth of one percent of the class members have filed any objections to this settlement. Of the 153 objectors, few objected to the provision for monetary relief to the named plaintiffs; the vast majority simply wished to receive the $3,000 liquidated amount for class members with pending charges of discrimination. *See* conclusion 17 below. *Third*, plaintiffs have negotiated monetary relief for part of the class, as indicated above. Class members with pending charges of racial or ethnic discrimination arising from OPM's use of the PACE for competitive hiring will receive $3,000 in monetary relief without having to prove any actual earnings loss if their charges were filed before January 15, 1981.[11] This compensates these class members for the loss of their right to file an independent lawsuit seeking potentially greater individual relief, and avoids the risks of inconsistent adjudications or conflicting remedial orders. *Cf. Lo Re*, 19 FEP Cases at 1371; *Women's Committee*, 76 F.R.D. at 182. While such class members may not opt out of this settlement, they are nonetheless placed in a preferred position for having

"felt strongly enough about [their] claim of discrimination to have taken this affirmative step." *Women's Committee, supra*. *Fourth*, since the relief for the class is fair and adequate taken apart from the relief for the named plaintiffs, and since the relief for the named plaintiffs is a reasonable compromise of their claims when considered apart from the relief for the class, a settlement combining both reasonable compromises is undeniably reasonable. A plaintiff should not be penalized for having agreed to take on the mantle of class representation. An individual settlement could most likely have been reached in this case far more quickly than the twenty-three month period it took to hammer out the class relief, and a class representative's willingness to delay individual relief in order to obtain relief for the class should not be made the occasion for requiring the representative to waive individual consideration of his or her claims. As the Sixth Circuit stated in *Thornton v. East Texas Motor Freight*, 497 F.2d 416, 420 (6th Cir., 1974), "[w]e also think there is something to be said for rewarding those drivers who protest and help to bring rights to a group of employees who have been the victim of discrimination." Similarly, in *Bryan v. Pittsburgh Plate Glass Co.*, 59 F.R.D. 616, 617 (W.D. Pa., 1973), *aff'd*, 497 F.2d 799 (3rd Cir. 1974), *cert. den.*, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974), *reh. den.*, 420 U.S. 313, 95 S.Ct. 836, 42 L.Ed.2d 844 (1975), the courts approved a settlement in which "special awards" in the aggregate amount of $17,500 were provided "to those members of the plaintiff class who were most active in the prosecution of this case and who devoted substantial time and expense on behalf of the class." [12]

11. The January 15, 1981 cutoff date serves as a rule-of-thumb separating those class members who filed their own charges of discrimination completely independently of the Notice in this case—these persons are the intended beneficiaries of paragraph 21 of the Consent Decree providing for these payments—and persons who are likely to have filed such charges as a result of their having learned of the January 15, 1981 preliminary approval of this settlement through the news media or through notice.

The January 15, 1981 date was contained in attachments to the Orders of May 19, 1981 and June 8, 1981, herein. The use of January 15, 1981 as the cutoff date is entirely proper.

12. This case does not directly involve the *Thornton* and *Bryan* rationale, because the named plaintiffs here are not receiving monetary compensation independent of backpay for their services in obtaining class relief, but the approach of these cases helps demonstrate the

18. The fact that only one-sixth of one percent of the class has chosen to object to the settlement is an important indication of its fairness and adequacy. In *Kincade v. General Tire & Rubber Co.*, 635 F.2d at 506 n.4., the Fifth Circuit found it significant that only one nonplaintiff class member, out of 500, had appealed from the approval of the settlement. In the case at bar, only roughly one class member per 800 is still maintaining an objection. *See also Cotton v. Hinton*, 559 F.2d at 1333 (affirming the approval of a settlement to which 50% of the active black employees of the defendant had objected); *Bryan v. Pittsburgh Plate Glass*, 494 F.2d at 803 (affirming the approval of a settlement to which more than 20% of the class had objected); *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D.Cal.1980) (where there are only three objectors out of a class of 2,500, an objection rate slightly below that herein, "the overwhelming sentiment of the class is in favor of the Decree, a factor which provides strong support for the fairness of its terms."); *Boyd v. Bechtel Corp.*, 485 F.Supp. 610, 624 (N.D.Calif.1979) (although 16% of the class objected to the settlement, "the Court finds persuasive the fact that eighty-four percent of the class has filed no opposition."). By contrast, the settlement in *Pettway* was disapproved when all named plaintiffs, and 70% of the class, objected. 576 F.2d at 1216–17.

19. The Court has received objections from some persons urging that the claims of blacks and Hispanics harmed solely by the internal, noncompetitive use of the PACE for promotions, selection for Upward Mobility or intern positions, and the like, should have been included in the settlement. Although such persons are not in the settlement class defined in ¶ 3 of the Consent Decree, they were expressly included, over the objection of the defendant, in the class certified and defined in the Order entered on November 12, 1980. They clearly have standing to raise their objection.

20. The Consent Decree expressly provides that it "does not resolve the claim of, or otherwise bind, any person who has been adversely affected by any use of the PACE for internal placements." Consent Decree, ¶ 6(c). *See also*, ¶ 1 (first full paragraph on p. 2). Thus, such persons are free to pursue their own claims of discrimination. Counsel for plaintiffs have informed the Court that a number of administrative charges or lawsuits involving internal use of the PACE are pending, and that class certification is sought in at least some of these cases. The Consent Decree protects the interests of the settlement class herein and avoids the risk of inconsistent adjudication and of conflicting remedial orders by providing that all internal use of the PACE shall end if and when the Consent Decree goes into effect, and by providing that the government shall not thereafter defend the validity of the PACE for such internal use in any administrative or judicial proceedings challenging such internal use of the PACE under Title VII. Consent Decree, ¶¶ 12(a), 12(h), 15 and 16. These provisions are of obvious benefit to these former class members who are now excluded from the settlement class.

21. For the reasons stated herein, Blacks and Hispanics who claim to have been harmed by the internal use of the PACE will not be prejudiced in any way by their removal from the class for purposes of settlement. Until the entry of the Order granting final approval to the Consent Decree, the period of limitations, and their time for filing their own charges of discrimination, have been tolled by the named plaintiffs' charges and by their filing of this lawsuit. *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974); *Barrett v. United States Civil Service Comm'n*, 439 F.Supp. 216, 217–18 (D.D.C., 1977). It is therefore still possible for these former class members to file timely administrative claims of discrimination. Many of the communications

reasonableness of avoiding any penalty for undertaking class representation by allowing the class representative's claims to be resolved on

an individual basis rather than a classwide basis.

sent to the Court do not indicate whether the class members claimed to have been harmed by the internal use of the PACE or by use of the PACE for competitive external hiring. Each person who has written to the Court before or after the May 1, 1981 deadline for comments on the Consent Decree, and whose statement does not clearly indicate that he or she falls outside of the group of former class members harmed by internal use of the PACE, shall be provided with notice in the form attached to this Order.[13] This notice will advise the former class members that they are no longer members of the class and that they should contact counsel for plaintiffs for additional information concerning their rights. This notice will avoid any prejudice to such former class members. Their objections to their exclusion from the settlement class are accordingly overruled.

■ 22. Mr. Wallace has complained that the Consent Decree is improper because it does not contain an admission of liability by the government. The objection is without merit, and is overruled. *Swift & Co. v. United States*, 276 U.S. 311, 327, 48 S.Ct. 311, 315, 72 L.Ed. 587 (1928). "[V]ery few consent decrees would be negotiated if an admission of liability by the defendants was a *sine qua non.*" *EEOC v. American Tel. & Tel. Co.*, 419 F.Supp. 1022, 1038 n.16 (E.D.Pa., 1976), *aff'd*, 556 F.2d 167 (3rd Cir. 1977), *cert. den.*, 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978).

■ 23. Some objectors have stated concerns that the government may not live up to its obligations under the Consent De-

cree. The Consent Decree provides for the establishment of a monitoring committee, composed of representatives of both plaintiffs and defendants, to oversee the implementation of the Decree, for regular reports to be made to the named plaintiffs, whom the Court has already found to be adequate class representatives, for the payment of attorneys' and experts' fees and costs for monitoring the defendants' compliance with the Consent Decree, and for a comprehensive enforcement scheme for handling any problems. Consent Decree, ¶¶ 17–18, 23–29, and 32. While the Court has no need to review all of the raw data which will be examined by the monitoring committee, paragraph 7 of the Consent Decree plainly contemplates that the Court will receive regular reports concerning the government's actions under the Consent Decree. Moreover, the Court may at any time exercise its inherent power to direct that any of the raw data generated under the Consent Decree be provided to it. The scheme for providing information in this case is closely similar to that approved in *United States v. Allegheny-Ludlum Industries*, 517 F.2d at 873–75, and will ensure adequate judicial supervision of the defendants' compliance with the Consent Decree. These objections are overruled.

■ 24. Some objectors have stated concerns that a variety of possible events may frustrate the goals of the Consent Decree. The Court has inherent power, for good cause shown and in appropriate circumstances, to modify the obligations of the Consent Decree in order to further its pur-

---

**13.** The earliest charge of discrimination filed by the named plaintiffs herein under 5 C.F.R. Parts 300 and 713 was filed by mail on May 16, 1978. (August 25, 1981 Affidavit of Richard T. Seymour, ¶ 2; exhibit 3 to the affidavit). Those former class members seeking relief from internal uses of the PACE which occurred prior to May 16, 1978 must file their complaint as to such use with their agency by contacting an EEO Counsellor within any time remaining after receipt of the attached Notice in the original 30-day period for filing individual charges, or 90-day period for filing class charges, after subtracting the number of days between their rejection as a result of the internal use of the PACE and May 16, 1978. Those former class

members seeking relief from internal uses of the PACE which occurred after May 16, 1978, must file their complaint as to such use with their agency by contacting an EEO Counsellor within 30 days after receipt of the attached Notice if they desire to file an individual charge of discrimination, or within 90 days after receipt of the attached Notice if they desire to file a class charge of discrimination. *Barrett*, 430 F.Supp. at 218–19; 29 C.F.R. § 1613.-214(a)(1)(i) (1980) (individual complaints); 29 C.F.R. § 1613.602(a) (1980) (class complaints). Nothing in this Order shall be construed to limit the discretionary authority of any agency under 29 C.F.R. § 1613.214(a)(4) (1980) to extend the time limits in an appropriate case.

poses in light of unforeseen problems which may arise. Paragraph 6(d) of the Consent Decree expressly recognizes this right. In *United States v. Swift & Co.*, 286 U.S. 106, 114–15, 52 S.Ct. 460, 462–63, 76 L.Ed. 999 (1932), the Court stated that, regardless whether a decree was entered as a result of litigation or by consent:

> . . . a court does not abdicate its power to revoke or modify its mandate if satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong. . . .

Accord, *Brown v. Neeb*, 644 F.2d 551, 559–60 (6th Cir., 1981). These objections are overruled.

25. Some objectors have stated concerns that some provisions of the Consent Decree may be ambiguous. Certainly, the Consent Decree uses terms, such as "reasonable" and "all practicable efforts", which may have different meanings in different factual situations. However, no purpose would have been served by attempting to spell out, with precision, all possible factual situations so that more exact terminology could be used. Paragraph 2(a) of the Consent Decree recognizes that some construction of its terms will be necessary, and sets forth the decretal goals which the Consent Decree should be construed to effectuate. *And see, EEOC v. Safeway Stores*, 611 F.2d 795, 798 (10th Cir. 1979), *cert. den.*, 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 809 (1980), stating that in construing a consent decree, ". . . a court should adopt an interpretation which renders the judgment 'more reasonable', effective, and conclusive." (Citations omitted).

26. Five class members (Anthony Baird, Iris Rogers, Sharon Hargrove, John Sheppard and Cynthia Sheppard) have objected to the Consent Decree on the ground that they had relied on the *Luevano* lawsuit, and its status as a class action, in refraining from filing their own discrimination claims against the PACE. They claim that they should also be entitled to obtain backpay and assistance in finding Federal employment under the settlement. Anthony Baird, Iris Rogers, and Sharon Hargrove took the PACE during the fall of 1975, while John Sheppard took the PACE during the spring of 1977. Cynthia Sheppard took the PACE during December of 1975. The regulations under 5 C.F.R. Part 713 in effect during this period of time (1975–1977) required a complainant seeking to raise a claim under Title VII to notify the appropriate agency within 30 days of the allegedly discriminatory actions. The time under 5 C.F.R. Part 300 was only fifteen days. Thus, the time for compliance by these class members with this jurisdictional requirement would have expired even before Mr. Luevano, the named plaintiff, had filed his administrative class complaint on May 16, 1978, or before the lawsuit was filed on January 29, 1979. The Court thus concludes that the claims of Anthony Baird, Iris Rogers, Sharon Hargrove, Cynthia Sheppard and John Sheppard would have been time-barred even absent their alleged reliance upon this lawsuit. Further, the Court has found that they did not take, or omit to take, any timely action in reliance upon this lawsuit, except for the filing of their claims.

27. There remain for disposition a number of minor objections, all thoroughly considered, including Samuel B. Wallace's objection that PACE test results will continue to be graded in Macon, Georgia, his submission constituting objections in part or in whole, of July 9, 1981 (motion for Rule 36 Request for Admission), September 21, 1981 ("Comment on Final Consent Decree"), and "Affirmation" (permitted to be filed November 18, 1981). Other objections are that the Decree does not provide relief under the Equal Pay Act and include the claims of two class members assertedly dying of incurable diseases who seek the death benefits and insurance benefits available to Federal employees. While these objections are of understandable importance to the protesting individuals, they are plainly insufficient under the law to bar final approval of the Consent Decree, and do not require further discussion. All objections not expressly discussed above are accordingly now overruled.

28. While the Consent Decree does not provide for any quota relief, it does require the government to make "all practicable efforts" to eliminate any disproportionately adverse effect of continued use of the PACE during the phase-out period, or of alternative examining procedures during the periods specified in the Consent Decree, against blacks or against Hispanics. Such race-conscious relief is clearly constitutional. In *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), the Court held in a series of opinions that the Constitution was not violated by the 10% minority business set-aside provisions of the Public Works Employment Act of 1977, Pub.L. 95–28, 91 Stat. 116, because it was not invidiously directed against members of minority groups, *cf. Strauder v. West Virginia*, 100 U.S. 303, 308, 25 L.Ed. 664 (1880), because it helped provide a remedy for past discrimination, and because it would help ensure the absence of any future discrimination. Similarly, in *Morton v. Mancari*, 417 U.S. 535, 554, 94 S.Ct. 2474, 2484, 41 L.Ed.2d 290 (1974), the Court upheld a statutory hiring preference for tribal Indians in Bureau of Indian Affairs employment, in part because it would make the BIA more responsive to the needs of its constituent groups. In *United Jewish Organizations of Williamsburgh v. Carey*, 430 U.S. 144, 165, 97 S.Ct. 996, 1009, 51 L.Ed.2d 229 (1977), the Court approved New York's use of racial criteria in drawing the lines for voting districts, to ensure fuller black participation in the political process. Time and again, the Court has upheld the propriety of race-conscious relief or of quotas in racial discrimination cases brought under the Constitution or under the civil rights laws. *E.g., Swann v. Charlotte-Mecklenberg Board of Education*, 402 U.S. 1, 18–21, 91 S.Ct. 1267, 1277–1279, 28 L.Ed.2d 554 (1971) (upholding racially based attendance assignments); *McDaniel v. Barresi*, 402 U.S. 39, 41, 91 S.Ct. 1287, 1288, 28 L.Ed.2d 582 (1971); *North Carolina Board of Education v. Swann*, 402 U.S. 43, 46, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971) ("Just as the race of students must be considered in determining whether a constitutional violation has occurred, so also must race be considered in formulating a remedy."). In the words of Chief Justice Burger, joined by Justices White and Powell:

. . . [T]he authority of a court to incorporate racial criteria into a remedial decree also extends to statutory violations. Where federal antidiscrimination laws have been violated, an equitable remedy may in the appropriate case include a racial or ethnic factor.

*Fullilove*, 448 U.S. at 483, 100 S.Ct. at 2777, 65 L.Ed.2d at 927.

29. Intense and continuing scrutiny of the entire proceedings leads to the unequivocal conclusion that the Consent Decree to which final approval will now be given is fully responsive to the mandate to vanquish discrimination based on racial or ethnic factors in the work place and is, above all, just: lawful, fair, adequate and reasonable.

For the reasons stated above, it is hereby ORDERED, ADJUDGED and DECREED, that:

1. The Consent Decree provides fair and adequate relief for the class, while serving the legitimate interests of the government in hiring capable employees to work in the 118 job categories covered by this Consent Decree. Its entry is in the public interest, and is hereby given final approval.

2. The redefinition of the class contained in paragraph 3 of the Consent Decree is hereby given final approval under Rule 23(b)(2), F.R.Civ.P. Each class member who has written to the Court, whether before or after May 1, 1981, and whose statements do not clearly preclude the possibility that he or she was harmed by the internal use of PACE, shall be sent a Notice in the form attached hereto, by counsel for the parties.