**NATIONAL TREASURY EMPLOYEES UNION, Plaintiff,**

v.

**Donald J. DEVINE, Director, Office of Personnel Management, Defendant,**

**National Federation of Federal Employees and American Federation of Government Employees, AFL–CIO, Plaintiffs-Intervenors.**

**Civ. A. No. 83–3322.**

United States District Court, District of Columbia.

Dec. 30, 1983.

---

**8.** The court declined to adopt *Wehr's* reckless-ness dictum. *See* 640 F.2d at 980 n. 7.

Lois G. Williams, Director of Lit., and Gregory O'Duden, Richard Adelman, Kerry L. Adams, Nat. Treasury Employees Union, Washington, D.C., for plaintiff.

Linda L. Cromwell, Paul Blankenstein, Richard Greenberg, Dept. of Justice, and Joseph A. Morris, Office of Personnel Management, Washington, D.C., for defendant.

Catherine Waelden, Patrick J. Riley, Nat. Federation of Federal Employees, Washington, D.C., for plaintiff-intervenor Nat. Federation of Federal Employees.

Mary E. Jacksteit, Mark D. Roth, Washington, D.C., for plaintiff-intervenor American Federation of Government Employees, AFL–CIO.

William J. Olson, Daniel F. Hayes, Smiley, Olson, Gilman & Pangia, Washington, D.C., for amicus curiae Public Service Research Council.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

### Introduction

On November 12, 1983, Congress hastily passed House Joint Resolution 413 ("H.J. Res. 413"), the Second Continuing Resolution for Fiscal Year 1984, which became Public Law 98–151 when signed by President Reagan on November 14, 1983. The Joint Resolution was a stop-gap emergency appropriation measure which became necessary because funding authorization for various agencies of the federal government and a multitude of programs had expired two days earlier, on November 10, 1983. The issue presently before this Court is whether, and to what extent, section 101(f) of H.J.Res. 413 affects or limits personnel regulations previously issued by the Office of Personnel Management ("OPM") in final form on October 25, 1983. That issue involves troublesome questions of statutory interpretation and Congressional intent. The plaintiff National Treasury Employees Union ("NTEU"), a bargaining representative for 110,000 federal employees, contends that the Joint Resolution bars the implementation of the OPM regulations. The defendant Donald J. Devine, Director of OPM contends that this Court is without jurisdiction to consider the issue, and alternatively, that H.J.Res. 413 does not affect

or limit the responsibilities of the OPM in any way.

The matter was presented before the Court on the government's motion to dismiss and on cross motions for partial summary judgment. The issues were carefully briefed and ably argued. For the reasons set out below, the Court grants the relief sought by the National Treasury Employees Union and determines that the challenged regulations of the Office of Personnel Management published on October 25, 1983 should not be implemented.

### Background

#### A.

On November 7, 1983, NTEU filed a complaint challenging the October 25 personnel regulations issued by OPM. The regulations related to reduction in force (RIF) procedures, performance management systems for federal employees, and pay administration in the federal sector under the Fair Labor Standards Act. 29 U.S.C. §§ 201 et seq. The reduction in force and the performance management system proposals were to become effective on November 25, 1983, and the pay administration proposals on February 22, 1984.[1] 48 Fed. Reg. 49462–98 (1983) (to be codified at 5 C.F.R. §§ 300, 335, 351, 430–31, 451, 531–32, 540, 551, 771).

NTEU sought declaratory and injunctive relief and requested the Court to set aside and declare those regulations null and void. In an amended complaint, filed November 21, 1983, it also requested that the OPM Director be enjoined to withdraw the proposals because of H.J.Res. 413, the continuing funding resolution for Fiscal Year 1984.

Despite the enactment of H.J.Res. 413, Director Devine announced on November 21, 1983, that the regulations would become effective as scheduled on November 25, 1983. Thereafter, NTEU applied for and on November 23 was granted a temporary restraining order, staying implementa-

---

1. The parties agree that the February 1984 date has no material bearing on the issue presently  under consideration.

tion of the regulations.[2] As a result of an agreement and subsequent representations of the parties, the temporary restraining order was extended through December 19, 1983. Because the matter appeared susceptible to final resolution on the merits by way of cross motions for summary judgment, an expedited schedule for briefing was arranged. The matter was ably argued on the merits by counsel on December 16 and 20, 1983. The government agreed to an extension of the temporary restraining order through December 31, 1983.

On November 29, 1983, the plaintiff and the defendant stipulated that the cross motions for summary judgment would address only the first cause of action set out in the plaintiff's Amended Complaint of November 21. The stipulation also provided, *inter alia*, that should plaintiff be awarded judgment on that cause, a final judgment would be entered under Rule 58, Fed.R. Civ.P. The Amended Complaint alleges:

### FIRST CAUSE OF ACTION

38. In passing H.J.Res. 413, Congress demonstrated its intention to bar totally the operation of OPM's October 25, 1983 regulation affecting employee compensation and RIF rights in the Federal sector.

39. By declaring that these regulations, which embody OPM's earlier proposed regulations of March and July, 1983, are to become operative on November 25, 1983, defendant Devine has willfully violated H.J.Res. 413.

40. In view of H.J.Res. 413, OPM's regulations of October 25, 1983 should be declared null and void and ordered to be withdrawn.[3]

B.

The history of the regulations and Congress's apparent serious misgivings with them sheds considerable light on the effect of H.J.Res. 413 on the October 25 regulations. In accordance with the rule-making requirements of the Administrative Procedure Act (APA), 5 U.S.C. § 553, the regulations were first published and subjected to notice and comment on March 30, 1983. 48 Fed.Reg. 13341 *et seq.* Responding to widespread criticism, OPM published and invited comment on a new version of the regulations, on July 14, 1983. 48 Fed.Reg. 32279 *et seq.*

Congress, however, was not satisfied with even the second proposed version, and on August 15, 1983, prohibited OPM from expending any funds before October 15, 1983, "to adopt, to issue, or to carry out a final rule or regulation, a final revision, addition, or amendment to regulations, or a final statement of policy" based on the proposed regulations published March 30 and July 14, 1983.[4] *See* 129 Cong.Rec. H6440–41 (daily ed., Aug. 3, 1983); *id.* at S11431–36. When Congress enacted that restriction on the expenditure of funds, OPM's funding was due to expire with the end of fiscal year 1983, so that the restriction extended some 15 days beyond the period for which OPM was funded at the time.

Because of the pressing need for funding of the federal government for the approaching Fiscal Year 1984, Congress was forced to sidestep the regular appropriations process, and instead focus attention on a continuing resolution for funding. Accordingly, on October 1, 1983, it enacted

---

2. On November 22, 1983, National Federation of Federal Employees (NFFE), C.A. 83–3517, and on November 23, 1983, American Federation of Government Employees, AFL–CIO (AFGE), C.A. 83–3532, also filed a similar complaint, based on H.J.Res. 413. On December 6, 1983, this Court issued an Order permitting NFFE and AFGE to intervene as plaintiffs. On December 19, 1983, this Court issued an Order permitting the Public Services Research Counsel to file a brief *amicus curiae* supporting the position of defendant.

3. On December 19 plaintiff filed a Second Amended Complaint, enlarging upon the allegations of standing set out in the First Cause of Action. On December 27 an order was entered granting leave to file the Second Amended Complaint.

4. Department of Transportation and Related Agencies Appropriations Act, 1984, Pub.L. 98–78, § 323, 97 Stat. 453 (1983).

House Joint Resolution 368, 97 Stat. 733 (1983), the First Continuing Resolution for Fiscal Year 1984. Sections 101(d) and 102 of the Joint Resolution authorized funds for OPM at the 1983 levels for the period October 1 through November 10, 1983. But Congress did not include there any funding limitation on OPM's issuance of final personnel regulations. Thus, from October 15, 1983 (when the restriction imposed by the Department of Transportation and Related Agencies Appropriation Act of 1984 expired) through November 10, 1983 (when OPM's funding under the First Continuing Resolution expired), OPM had funds to carry out its responsibilities without being hampered by legislation inhibiting the expending of those funds on personnel regulations. Consequently, on October 25, 1983, Director Devine issued the personnel regulations at issue here, with an effective date of November 25, 1983.

However, even before OPM issued the final regulations on October 25, 1983, Congress had again begun the process aimed at barring OPM's expenditure of funds on personnel regulations. On October 18, 1983,—just three days into the "restrictionless" period and one week before OPM's issuance of the final rules—the House Appropriations Committee reported H.R. 4139. H.R.Rep. No. 417, 98th Cong., 1st Sess. (1983). That bill proposed appropriations for the fiscal year ending September 30, 1984 for a number of federal agencies, including OPM, the Federal Labor Relations Authority and the Merit Systems Protection Board. Section 508 [5] of that bill, the Hoyer (D.Md.) amendment, provided:

> None of the funds appropriated under this Act shall be obligated or expended to implement, promulgate, administer, or enforce the proposed Office of Personnel Management regulations and the proposed Federal Personnel Manual issuances published in the Federal Register on

March 30, 1983, ... as superseded by proposed regulations and Federal Personnel Manual issuances published in the Federal Register on July 14, 1983....

Obviously, because H.R. 4139 was reported to the House prior to October 25, 1983, it made no specific mention of the final October 25th regulations.

The House did not turn to H.R. 4139 until after OPM issued its regulations on October 25. On October 27, 1983, the House passed H.R. 4139, with the Hoyer amendment left unchanged, despite the fact that in the intervening period OPM issued its final regulations.

Though the Senate did not act on H.R. 4139 or on the Senate version of the regular appropriations bill,[6] H.R. 4139 was still enacted into law, albeit not via the typical appropriations route. Because the First Continuing Resolution only funded the federal government from October 1 to November 10, 1983, Congress was again compelled to suspend the regular appropriations process and turn to a continuing resolution. On November 12, 1983,—two days after funding for the federal government had expired—Congress passed H.J. Res. 413, the Second Continuing Resolution for Fiscal Year 1984, which as noted previously, became Public Law 98–151 on November 14, 1983. Importantly, H.J.Res. 413 incorporated by reference H.R. 4139, including the Hoyer amendment. The relevant provision of H.J.Res. 413 provides that:

> [T]he following sums are hereby appropriated ... Section 101(f): Such amounts as may be necessary for continuing the activities ... which were provided for in H.R. 4139, the Treasury, Postal Service and General Government Appropriations Act, 1984, as passed by the House of Representatives on October 27, 1983, *to*

**5.** In the Senate version of H.R. 4139, dated October 31, 1983, § 508 was renumbered as § 507.

**6.** The Senate version of H.R. 4139, S.1646 was reported by the Senate Appropriations Commit-

tee on July 20, 1983. S.Rep. No. 98–186, 98th Cong., 1st Sess. (1983). The Senate bill contained no restrictions on the OPM's expenditure of funds for the personnel regulations.

*the extent and in the manner provided for in such Act....*

(Emphasis added).

In sum, H.J.Res. 4139 was reported out of committee before OPM issued its final regulations—and therefore contained no mention of them—and was passed by the House and incorporated into H.J.Res. 413 without any reference to the October 25th regulations *after* OPM issued those regulations.

Despite the enactment of H.J.Res. 413 with its incorporation of H.R. 4139 and the Hoyer amendment's restrictions on OPM spending, Director Devine announced on November 21, 1983, that the final regulations would become effective as scheduled. That announcement was based on an opinion from OPM's general counsel, which, in summary, opined:

> Notwithstanding limiting language in the Second Continuing Resolution of FY 1984, OPM's new rules on RIF, performance management, and overtime pay go into full force and effect on November 25, 1983, and all Government departments and agencies will be bound by them. The most prudent interpretation, however, holds that OPM is without funds to assist in the implementation of the new rules or to enforce their fair administration.[7]

### Standing and Jurisdiction

▬ The defendant's initial response to the NTEU complaint was that the Court lacked subject matter jurisdiction inasmuch as plaintiff has not suffered an injury in fact sufficient to provide standing to sue, that the plaintiff's claims are not reviewable in this Court, and that the plaintiff does not have a private right of action to enforce the funding limitation arising from H.J. Res. 413.

### A.

Whether or not a plaintiff has standing to commence a law suit is of course a threshold matter which should be resolved before any consideration is given to and attention focused on the merits of the controversy. If an initial determination is made that a plaintiff clearly lacks standing, many claims which on their face appear to be meritorious are summarily rejected and rightfully so. On the other hand, it frequently happens that many meritorious claims are summarily rejected on the standing issue because of a hasty, perfunctory analysis rather than a careful painstaking review and consideration of both the pleadings and the arguments of counsel for the parties.

As to the first claim, OPM contends that the plaintiff's several pleadings have not sufficiently alleged injury in fact, an essential element for standing. And thus, it urges that the complaint should be dismissed, since NTEU has not met the threshold requirement of showing either injury to itself as an organization or in a representative capacity, based upon injuries threatened or actually sustained by its members, because of actions taken by OPM. Those actions, of course, must be such that could be addressed and resolved in this litigation, for standing cannot be conferred upon the assumption that at some future time the plaintiff or its members might be adversely affected by actions taken under authority of the proposed regulations.

It is this Court's opinion that the plaintiff's Second Amended Complaint For Declaratory And Injunctive Relief, filed December 19, 1983, is more than sufficient to warrant a denial of OPM's effort to dismiss this proceeding. An undisputed assertion is that NTEU serves as the exclusive bargaining agent and representative for more than 110,000 federal employees and presumably has served in that capacity for a number of years. The amended complaint presents a reasonable and sufficient compliance with the line of decisions which support a claim of standing such as presented here. *See, e.g., International*

---

7. Exhibit F to NTEU's Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss or for Partial Summary Judgment, at 1, filed December 12, 1983.

*Ladies Garment Workers' Union v. Donovan,* 722 F.2d 795 (D.C.Cir.1983); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Particularly relevant allegations are found in paragraphs 41 to 43 of the Second Amended Complaint:

41. Plaintiff, and the members it represents, are persons suffering legal wrong or adversely affected or aggrieved by OPM's unlawful actions to effectuate the October 25, 1983 regulations, within the meaning of 5 U.S.C. 702.

42. OPM's actions to effectuate the October 25, 1983, regulations in violation of H.J.Res. 413 interfere with plaintiff's ability to negotiate collective bargaining agreements dealing with the subjects addressed in the regulations.

43. OPM's actions to effectuate the October 25, 1983 regulations in violation of H.J.Res. 413 harm the interests of NTEU's membership because the regulations would effect significant changes in the three important areas of personnel administration, i.e., the performance management of "incentive" system, rules for reductions in force, and overtime pay. Effectuation of the regulations would change the performance appraisal system applicable to all employees, so that plaintiff's members would be subject to new rules for determining their status and rights.

Further, in an unchallenged statement of material facts accompanying the motion for partial summary judgment, NTEU alleges that it represents and has represented the employment interests of Federal employees nationally in negotiating collective bargaining agreements, arbitrating grievances, filing unfair labor practices charges, lobbying Congress on such problems as pay, retirement and other economic benefits, and litigating individual and collective rights of employees in this and other Federal courts. The allegations of the complaint and other record representations clearly demonstrate that the NTEU "is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers."

*Warth v. Seldin,* 422 U.S. 490, 518, 95 S.Ct. 2197, 2215, 45 L.Ed.2d 343 (1975). Other relevant pleadings assert that the OPM regulations under question would substantially affect present promotion rights, retention of employment rights and compensation rights of the employees represented by the plaintiff.

The regulations are such that they will undoubtedly impact in some manner on a large segment of the government's civilian work force, including members of the plaintiff union. Indeed, the NTEU, as an association, is presently engaged in preliminary contract negotiations with several government agencies. In those negotiations it represents the members' interests and among the issues raised are matters covered by the challenged regulations.

More immediately, an affidavit of John McEleney, the Union's Assistant Director of Negotiations, describes current bargaining sessions with representatives of the U.S. Customs Service. He describes disputes over contract provisions which presently conflict with OPM's proposed regulations. This demonstrates clearly the present dilemma and immediate specific problems that have already surfaced. Plaintiff therefore has standing to sue on its own behalf and on behalf of its members. *See Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 341–43, 97 S.Ct. 2434, 2440–41, 53 L.Ed.2d 383 (1977). Thus NTEU seeks appropriate declaratory and injunctive relief to prevent a problem which would certainly arise if the regulations are implemented and become operative.

After a fair reading of the entire set of pleadings by the NTEU, it is difficult to accept the government's argument that the plaintiff lacks standing and that the complaint should be dismissed. If the NTEU has no standing to contest regulations which are claimed to have a far reaching impact on day-to-day working situations and an employee's career, dealing with job retention rights, performance appraisals, promotions and pay increases, it is difficult

to conceive of a more appropriate representative.

## B.

■ In addition to standing, Devine claims that this Court lacks jurisdiction to resolve NTEU's claim, because that claim must be processed only as provided for in the exclusive scheme established by the Civil Service Reform Act (CSRA), 5 U.S.C. §§ 1101 and 7101 *et seq.* Thus, according to Devine, an employee can contest an adverse action initiated by his federal employer before the Merit Systems Protection Board through the statutory appeals procedure, § 7513(d), and obtain judicial review in the United States Court of Appeals for the Federal Circuit, § 7703. Or, the employee or union may file a charge alleging an unfair labor practice with the Federal Labor Relations Authority, §§ 7116, 7118, whose final order is subject to judicial review in the appropriate court of appeals, § 7123. And, of course, there exists the option to pursue binding arbitration for certain grievances, § 7121(b)(3)(C). Either party to the arbitration may file exceptions with the Federal Labor Relations Authority, § 7122, and may under certain circumstances then seek judicial review in the appropriate court of appeals, § 7123. However, what the employee or union cannot do, according to Devine, is to bring a suit directly in a federal district court.

Devine is absolutely correct in his assertion that the CSRA's scheme is exclusive for the resolution of the grievances, adverse actions, and unfair labor practices which it encompasses. *Carter v. Kurzejeski,* 706 F.2d 835, 840 (8th Cir.1983). *See Carducci v. Regan,* 714 F.2d 171, 175 (D.C.Cir.1983); *Cutts v. Fowler,* 692 F.2d 138, 140 (D.C.Cir.1982); *Borrell v. United States International Communications Agency,* 682 F.2d 981, 990 (D.C.Cir.1982).[8] That principle of exclusivity will generally preclude suits in federal district court, even where those suits are dressed in the clothes

of the judicial review provisions of the APA, § 701 *et seq.* *See Carducci,* 714 F.2d at 175.

Here however, the Court is *not* confronted with the sort of controversy falling neatly within the CSRA's scheme. This is not the typical sort of labor altercation between a federal employee and his federal employer. Nor is this an action alleging by way of a grievance, adverse action or unfair labor practice, that a federal agency has violated either a provision of a collective bargaining agreement or one of its own regulations, or that the agency has infringed on the collective bargaining rights of a union. Rather, this is a traditional rule-making challenge brought under the APA by a party aggrieved by agency action, 5 U.S.C. § 702, alleging that OPM's rules are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A). Under section 702 of the APA, NTEU may challenge OPM's action on behalf of members who suffer legal wrong or who are aggrieved by the defendant's proposed changes in the several areas of personnel administration. *See Public Citizen v. Lockheed Aircraft Corporation,* 565 F.2d 708, 714 (D.C.Cir.1977).

In *International Ladies Garment Workers' Union v. Donovan, supra,* 722 F.2d 795, the Court of Appeals, in an opinion by Judge Edwards, sustained a rule-making challenge brought by, among others, certain unions contesting Department of Labor regulations regarding employment of workers in their homes. The court rejected the argument that because there existed what the defendants claimed was an exclusive statutory remedy, the plaintiffs could not seek judicial review of the regulations, *id.* at 805–807, and noted that "[t]he suggestion that provision of such an action evidences a clear and convincing intent to exclude all other judicial relief, and in particular the right of aggrieved parties to challenge allegedly arbitrary and capri-

---

8. An exception to the exclusivity of the CSRA's scheme may exist for certain constitutional claims. *Carducci,* 714 F.2d at 175–76; *Cutts,*

692 F.2d at 140; *Borrell,* 682 F.2d at 988–91. *See Kurzejeski,* 706 F.2d at 843 n. 9.

cious actions ... borders on the incredible." *Id.* at 807. Judge Hogan also entertained a suit by NTEU against Devine, wherein NTEU alleged that OPM's guidelines concerning the scope of collective bargaining in the federal government were arbitrary and capricious under 5 U.S.C. § 706 of the APA. *National Treasury Employees Union v. Devine,* No. 83–1346, slip op. (D.D.C., November 25, 1983).

### C.

■ Similarly, because this is simply a rule-making challenge, Devine's next argument also fails. Devine claims that NTEU has no private right of action to enforce a funding prohibition. *See National Treasury Employees' Union v. Campbell,* 654 F.2d 784, 789–94 (D.C.Cir.1981). *See also California v. Sierra Club,* 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981). That may be, but NTEU's cause of action is not grounded in the funding prohibition of H.J. Res. 413 and the Hoyer amendment so much as in the APA. An attempt under the APA to invalidate regulations by alleging that they are barred by an appropriations measure is not the same as enforcing a private right of action deriving directly from the appropriations measure. Had NTEU sought an order requiring defendant Devine personally to reimburse the public treasury for any money he may have spent in violation of the Hoyer amendment, that type of action would have constituted the private right of action which would be barred under *Campbell.*

In short, this Court has jurisdiction under the APA, coupled with the federal question statute, 28 U.S.C. § 1331; *see Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), to rule on the NTEU's challenge to the October 25th regulations.

### *The Hoyer Amendment—Its Effect On The October 25th Regulations*

The defendant makes two alternative arguments in his effort to salvage the October 25th regulations: First, he argues that the Hoyer amendment to H.R. 4139, incorporated by reference in section 101(f) of H.J.Res. 413, makes no mention whatsoever of the October 25th regulations, and therefore bars only the proposed regulations of March and July 1983, but not the final regulations of October 25. Second, defendant contends that even if the amendment does encompass the October 25 regulations, they still can go into effect without running afoul of the amendment. According to the defendant, all Congress did was bar funding, but did not invalidate the regulations themselves. Since the implementation of the October 25th regulations require no further expenditure of funds by OPM, the regulations can become effective despite the legislation.

The Court accepts neither of these two arguments, and holds that the somewhat confused legislative history indicates that Congress meant to include the October 25th regulations within its funding restriction, and in so doing intended to render the regulations without force or effect.

### A.

■ The difficulty in assessing the intent of Congress stems in part from the pressure of events in the fall of 1983, when Congress was contemplating OPM's regulations in the face of a looming cut-off of funding for the federal government. That difficulty is compounded by the fact that the Hoyer amendment was reported out of committee before the issuance of the October 25th regulations, but was then passed by the House and incorporated into its Second Continuing Resolution, H.J.Res. 413, after the regulations were issued. Clearly, when reported out of committee, the amendment was phrased so as to block funding for all versions of the proposed regulations extant up until that point. The pivotal question is whether Congress intended the amendment also to encompass the October 25th regulations.

A number of reasons indicate that despite the language referring only to the March and July proposals, the amendment nonetheless reaches the October 25th regulations. First, defendant's argument

would mean that Congress, at a moment when confronted with the possible halt of the federal government and its programs, ignored the October 25th regulations and instead focused on the March and July 1983 proposals. But OPM had already discarded those proposals by promulgating the final October 25th version. It is most unlikely that Congress, when its efforts elsewhere were of such importance, would expend its efforts in blocking legislatively in an emergency appropriations measure, what OPM had already rejected administratively. If all Congress sought was to prevent some future attempt by OPM to resurrect the proposed regulations—as defendant suggests was the case—it chose an exceedingly unusual time and means of so doing. The inescapable conclusion is that in the Hoyer amendment, Congress must have been concerned with the set of final regulations.

Second, the legislative history, though not free from ambiguity, suggests that Congress intended to include the October 25th regulations within the Hoyer amendment. Senator Warner (D.Va.), an opponent of the regulations and a supporter of the Hoyer amendment, stated on November 12, 1983 (the date that H.J.Res. 413 was passed by Congress) that "this resolution requires a delay in the implementation of OMB [9] [sic] management regulations." 129 Cong.Rec. S16042 (daily ed., Nov. 12, 1983). An opponent of the amendment, Representative Dannemeyer (R.Cal.), in referring to the October 25th regulations, stated on November 10, 1983, that "[t]he Hoyer Amendment precludes these needed changes from being implemented." 129 Cong.Rec. H9632 (daily ed., Nov. 10, 1983). Representative Parris (R.Va.), in commenting on the amendment soon after October 25th, said, "I rise in support of the effort to prevent implementation of the OPM reduction in force and pay regulations." 129 Cong.Rec. H8731 (daily ed., Oct. 27, 1983). While supporting the initiative taken by OPM in addressing certain inequities suffered by managers and supervisors on the federal payroll, Representative Parris still opposed other changes embodied in the October 25th regulations, and therefore supported the Hoyer amendment, saying that "Congress has a responsibility to preserve the integrity of the civil service by preventing OPM from making such major changes by regulatory fiat." *Id.* at H8732. Of importance is the fact that all such expressions of congressional intent were made after the October 25th regulations were issued, while Congress was in the process of passing the Hoyer amendment, and then incorporating it in H.J.Res. 413.

Less determinative, but still helpful, is the legislative history dating to the period preceding OPM's promulgation of the final regulations. In a House Report dated October 18, 1983, the House Committee on Appropriations commented on the Hoyer amendment,[10] saying that:

The Committee notes that the proposed regulations constitute major reforms in employee compensation, job retention rights, and labor-management collective bargaining rights. The Committee also notes that the authorizing committees with jurisdiction over these areas are conducting an ongoing review of the proposed regulations. *The authorizing committees with jurisdiction over the personnel issues raised in the proposed regulations have indicated a desire to prevent implementation of the regulations until such time as they have reported legislation of the regulations covering the personnel issues raised in the proposed regulations.* Since the Committee believes that the Office of Personnel Management's proposed regulations constitute major changes in the civil service system and *since the relevant authorizing committees are considering legislation that may supercede these proposed regulations,* the Committee has recommended that no funds con-

---

**9.** The defendant concedes that "OMB" is an error. Senator Warner was apparently referring to OPM's October 25th regulations.

**10.** H.R.Rep. No. 98–417, 98th Cong., 1st Sess. (1983) at 76.

tained in this Act be made available for the implementation, administration, or enforcement of the Office of Personnel Management proposed regulations published in the Federal Register on March 30, 1983 ... [and] on July 14, 1983....

(Emphasis added). From that report, one may conclude that the October 25th regulations, though not yet promulgated, still fell within the reach of the Hoyer amendment, since Congress indicated that it was against any regulatory change, but rather felt that the matter should best be left for the legislature.

While these pronouncements seem clear, not all the legislative history is as definitive. For example, on October 27, 1983, Representative Hoyer himself, the sponsor of the amendment, entered into a colloquy with Representative Roybal (D.Cal.), Chairman of the Appropriations Subcommittee. Both NTEU and Devine argue that the colloquy supports their respective positions. Representative Hoyer raised the vexatious problem that two days earlier OPM promulgated the final regulations, while the language of the previously approved Hoyer amendment made no mention of them. He noted:

In discussing the possibility of offering an amendment to this section which would include therein a preclusion on the implementation of the October 25 regulations, I have been informed that such an amendment would probably be in order.

However, I have, in discussions with the chairman of the committee, determined that there is another vehicle on which this can be done if, in fact, accommodations and agreements cannot be reached between the Congress and the Office of Personnel Management.

129 Cong.Rec. H8731 (daily ed., Oct. 27, 1983). He then directed a number of questions to Representative Roybal,

Mr. Chairman, at this time I would like to ask you, is it your belief that it is the intention of the committee in this bill to preclude the implementations of the personnel regulations that were published first in March and then in July?

I yield to the gentleman for purposes of this colloquy.

Mr. ROYBAL. It is definitely the intention of the committee to do so.

Mr. HOYER. Is it the opinion of the chairman, had the most recent October 25 regulations been published prior to our markup, that they would have been included within the language of this bill?

Mr. ROYBAL. Yes, they would have.

Mr. HOYER. Mr. Chairman, is it also your opinion that if we find it necessary to do so, that language similar to section 508 can and will be included in the continuing resolution that will have to be passed prior to November 10, 1983?

Mr. ROYBAL. I would like to inform the gentleman that I hope we do not get to the continuing resolution stage. If we do get to that stage, we will act accordingly.

*Id.* NTEU argues that this passage supports its position, since Mr. Hoyer and Mr. Roybal indicated that the October 25th regulations would have been included in the Hoyer amendment had the regulations been published prior to the "markup." The defendant argues to the contrary, that this passage indicates that additional legislative action—never taken—specifically including those final regulations within the amendment's ban, was necessary. Along the same lines, the defendant cites the comments of Representative Conte (R.Mass.), an opponent, who recognized that the amendment barred the earlier, proposed version of the regulations. In commenting on the final regulations, however, Mr. Conte stated "I would hope we do not add a similar provision here today, but rather allow these new regulations to go forth....." *Id.* at H8712. Thus, according to Director Devine, Congressman Conte, like Congressmen Hoyer and Roybal in the colloquy, recognized that explicit legislative action in addition to the amendment was necessary to bar the final regulations. Since such explicit legislation was never enacted, the defendant argues that the October 25th regulations escaped the congressional ban.

Still, despite the legislative history supporting the defendant, an overview of that history in its entirety supports plaintiff's contention that Congress intended that the Hoyer amendment capture the October 25th regulations as well. In the context of his longstanding opposition to OPM's regulations, Congressman Hoyer's discussion of future legislation geared towards the final regulations may be viewed as perhaps no more than an exercise in caution. In any event, the weight of the legislative history supporting NTEU tilts the balance in its favor when weighed against the history favoring the defendant.

Defendant Devine also draws the Court's attention to H.R. 4293, 98th Cong., 1st Sess. (1983), reported out of committee on November 3, 1983, and which was before Congress as an alternative when, on November 12, 1983, it opted for H.J.Res. 413. H.R. 4293 contained a provision specifically including the October 25th regulations within its spending prohibition.[11] Devine argues that by rejecting that bill, Congress was indicating that it did not want to bar implementation of the October 25th regulations. But the difficulty with that argument is that H.R. 4293 contained so many other provisions, aside from that referring to OPM, that Devine should cite some legislative history revealing why that bill was rejected. Without such support, the Court cannot presume to conclude that H.R. 4293 was rejected for its inclusion of the October 25th regulations and not for any other reason.

### B.

■ The defendant's next argument is that even if the October 25th regulations fall within the scope of the Hoyer amendment, those regulations can still go into effect. Devine contends that OPM has already expended all funds necessary to implement the final regulations, and that at this point they become effective on their own, by operation of law, and can be implemented by those agencies not within the amendment's spending ban. True, OPM would not be able to fulfill its obligation to oversee implementation of the regulations, but Devine further claims that that congressionally mandated obstacle would not invalidate them in their entirety.

The difficulty, however, is that the new regulations *do* require additional expenditure of funds by OPM, even if other agencies not within the amendment's prohibition attempt to implement the regulations on their own. OPM plays an indispensable role in implementing and enforcing the regulations. An incomplete list of its responsibilities illustrates the point:

1. OPM is required to "make technical assistance available to agencies in the development of performance appraisal systems," 5 U.S.C. § 4304(a). Performance appraisal is an area governed by the new regulations. *See* 48 Fed.Reg. 49472 *et seq.*

2. OPM is required to review the performance appraisal system developed by each agency to ascertain whether the system meets the requirements of the Civil Service Reform Act, 5 U.S.C. § 4304(b)(1), and to correct any systems not in compliance with statute. § 4304(b)(3). Performance Management Plans must be approved by OPM. 48 Fed.Reg. at 49481 (to be codified at 5 C.F.R. § 430.207).

3. OPM must approve cash awards in excess of $10,000 for outstanding performance. 5 U.S.C. § 5403(e)(2). The new regulations contain a number of provisions implementing that responsibility. *See* 48 Fed.Reg. at 49490–91 (§ 540.109); 48 Fed. Reg. at 49484–85 (§ 451).

4. OPM is required to enforce veteran preferences. *See* 5 U.S.C. § 1302(b).

---

11. H.R. 4293 provided as follows:

None of the funds appropriated by this or any other Act shall be obligated or expended to implement, promulgate, administer, or enforce the proposed Office of Personnel Management regulations and the proposed Federal Personnel Manual issuances and the final rules and regulations and the interim rules and regulations published in the Federal Register on October 25, 1983, relating to 5 C.F.R. parts 351, 300, 335, 430, 431, 451, 531, 532, 771, 293, and 551 ....

*See also* H.R.Rep. No. 474, 98th Cong., 1st Sess. 6 (1983).

Those preferences are part of the new RIF regulations. *See, e.g.,* 48 Fed.Reg. at 49462 (Background); 48 Fed.Reg. at 49466 (§ 351.501(d)).

5. Under certain conditions, OPM must approve agencies' RIF plans. 48 Fed.Reg. at 49465–66 (§ 351.402(c) and § 351.403(c)).

6. OPM's consideration is required before an agency may act on certain exemptions under the Fair Labor Standards Act. 29 U.S.C. § 201 *et seq. See* 48 Fed.Reg. at 49497 (§ 551.207).

In short, OPM cannot simply step aside and view the new regulations as self-executing. Without OPM's active participation, the entire structure crumbles. Even though certain portions of the regulations do not require action by OPM, considering the breadth of OPM's role it is difficult to conceive that Congress intended for only certain portions to go into effect.

### C.

■■■ Lastly, Devine cautions the Court that because H.J.Res. 413 is an appropriations statute, there exists an especially strong presumption disfavoring any repeal by implication of OPM's statutory authority to promulgate personnel regulations, citing *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). The problem with that contention is twofold. First, though a repeal by implication is disfavored, especially when the claimed repeal rests on an appropriations measure, such repeal is not impossible. *See United States v. Dickerson,* 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940). Second, here H.J.Res. 413 does not repeal the agency's authority by implication; the repeal—or better, the bar—is explicitly provided for in the Hoyer amendment. Simply because the Court feels compelled to explore the statutory history to properly construe the amendment does not mean that the Hoyer amendment's spending bar constitutes a repeal by implication.

### Conclusion

NTEU and its members suffered injury in fact, and therefore have standing to sue. The exclusive scheme of the CSRA is not applicable here. This Court has jurisdiction under 28 U.S.C. § 1331 to entertain NTEU's rule-making challenge grounded in the APA, and to review OPM's promulgation of the October 25th regulations. In the Hoyer amendment, Congress blocked implementation of those regulations, and they are therefore without any effect whatsoever, as long as OPM's funding derives from H.J.Res. 413.

The Hoyer amendment in its most literal sense speaks only of the earlier versions of the regulations, not the October 25th version. Yet it is clear to this Court that Congress also intended that which it did not expressly articulate. This Court cannot blanch at effectuating Congress's intent, even if not enunciated with the clarity to be preferred. In the words of the late Justice Frankfurter,

> [I]f Congress chooses by appropriate means for expressing its purpose to use language with an unlikely and even odd meaning, it is not for this Court to frustrate its purpose. The Court's task is to construe not English but congressional English. Our problem is not what do ordinary English words mean, but what did Congress mean them to mean .... Here we have the most persuasive kind of evidence that Congress did not mean the language in controversy, however plain it may be to the ordinary user of English, to have the ordinary meaning.

*Commissioner v. Acker,* 361 U.S. 87, 94–95, 80 S.Ct. 144, 148, 4 L.Ed.2d 127 (1959) (Frankfurter, J., dissenting).

An appropriate Order consistent with this Opinion will be entered.

### FINAL JUDGMENT AND ORDER

In accordance with the Court's Memorandum Opinion filed in this proceeding on this date, it is

### ORDERED

That the motion of the defendant, Donald J. Devine to dismiss or for partial summary judgment on the First Cause Of Action

alleged in the Amended Complaint and the Second Amended Complaint is denied.

That the motion of the plaintiff, National Treasury Employees Union for partial summary judgment on the First Cause Of Action alleged in the Amended Complaint and the Second Amended Complaint is granted.

That the personnel regulations affecting the Federal Civil Service, published by the defendant on October 25, 1983, at 48 Fed. Reg. 49462–49470; 48 Fed.Reg. 49472–49492; and 48 Fed.Reg. 49494–49498 are declared null and void and the defendant and his agents and employees are enjoined from directly or indirectly taking any actions with respect to said regulations.

As to the First Cause Of Action, the Clerk of the Court shall enter a final judgment for the plaintiff, the Court determining that there is no just reason for delay. Rules 54(b), 58, Fed.R.Civ.P.