**NATIONAL TREASURY EMPLOYEES UNION, et al., Plaintiffs,**

v.

**Constance HORNER, Director, Office of Personnel Management, et al., Defendants.**

**Civ. A. No. 84–2573.**

United States District Court, District of Columbia.

Oct. 15, 1986.

See also 654 F.Supp. 1159.

Lois G. Williams, Richard S. Edelman, Washington, D.C., for plaintiffs.

Jeffrey S. Paulsen, Judith Ledbetter, Dept. of Justice, Civil Div., Washington, D.C., for defendants.

## OPINION

JOYCE HENS GREEN, District Judge.

This case grows out of the government's efforts to abolish the Professional and Administrative Career Examination ("the PACE"). That examination was challenged in *Luevano v. Campbell,* 93 F.R.D. 68 (D.D.C.1981), as having a discriminatory impact on black and Hispanic applicants for federal employment. As a result of that litigation, the government entered into a Consent Decree which provided for the discontinuation of the PACE within three years, and for the development of "alternative examining procedures" to govern hiring for the 118 jobs which previously made use of the PACE. Defendant Office of Personnel Management ("OPM") abolished the PACE on August 31, 1982, and announced that it was excepting the 118 jobs covered by the *Luevano* Consent Decree from the competitive service and placing them in Schedule B, a classification which, unlike the competitive service, permits hiring without requiring applicants to take a competitive examination. Among the positions converted from competitive to noncompetitive status was that of customs inspector. Plaintiff National Treasury Employees Union ("NTEU"), which represents customs inspectors along with other federal employees, brought this suit on behalf of itself and four named individuals, all customs inspectors, alleging that OPM's failure to conduct competitive examinations for entry level (General Schedule or "GS" 5 and 7) positions violates civil service statutes requiring competitive hiring, and is arbitrary and capricious, in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 701 et seq. The parties have filed cross-motions for summary judgment. For the reasons set forth below, the Court directs plaintiff National Treasury Employees Union to file an amended complaint within thirty days from the date of this Opinion, failing which this case will be dismissed for lack of standing.

## I.

With the exception of those in the Senior Executive Service, federal civil service employees serve in either the "competitive service," 5 U.S.C. § 2102(a)(1), or the "excepted service," 5 U.S.C. § 2103(a). 5 U.S.C. § 3302(1). Persons seeking employment in the competitive service must take a competitive examination, 5 U.S.C. § 3304, and are then ranked on a civil service register on the basis of their score. 5 C.F.R. § 332.401. When an agency wishes to fill a competitive service position, it must obtain from OPM a "certificate of eligibles," which lists the top three candidates on the appropriate register, *id.* § 332.402, and must then select an applicant from this list "with sole regard to merit and fitness." *Id.* § 332.404.

While Congress has stated that the selection and advancement of federal personnel "should be determined solely on the basis of relative ability, knowledge and skills, after fair and open competition," 5 U.S.C. § 2301(b)(1), it has granted the President the authority to make "necessary exceptions" from the competitive service. Persons seeking a position in the excepted service, therefore, need not take a competitive examination. Instead, each agency establishes its own application procedures, and prospective employees file separate applications with each. Pursuant to its statutory authority, OPM has established three classifications of excepted positions, only one of which, Schedule B, is relevant to this case. Schedule B includes "[p]ositions other than those of a confidential or policy-determining character for which it is not practicable to hold a competitive examination." 5 C.F.R. § 6.2.

Prior to 1982, the PACE was the competitive examination used to fill entry level positions for some 118 federal jobs. The *Luevano* Consent Decree called for the elimination of the PACE, and, in addition, prohibited OPM from replacing that examination with another single, comprehensive competitive test. Instead, the Decree provided that within three years of its effective date, "every job category which is cur-

rently subject to the PACE requirement shall, when filled by competitive examination, be filled on the basis of an examining procedure which is designed to examine for that particular job." *Luevano* Consent Decree, § 13(a). It further acknowledged that "[s]ome PACE job categories have relatively few vacancies and OPM may develop an alternative examining procedure for a group of such job categories." *Id.* On August 31, 1982, OPM abolished the PACE and placed the 118 affected jobs in Schedule B. The agency explained that converting the affected positions to excepted service status was appropriate because no alternative selection procedures were available, the number of new hires expected in these positions was low due to restrictions in federal employment, and the cost of developing validated alternative examining procedures would be prohibitive. 47 Fed. Reg. 38,257 (1982). Whenever possible, agencies were expected to fill vacancies either through internal placement, reinstatement of persons with civil service status or priority placement programs. Federal Personnel Management Letter 213–32.

Plaintiffs argue that the conversion of these positions to excepted service status has deprived them of certain privileges and protections they would otherwise enjoy as competitive service employees. They note, for example, that Schedule B employees, unlike their competitive service counterparts, do not have the right to appeal to the Merit Systems Protection Board (or arbitration where appropriate) from an agency decision removing or demoting them for alleged unacceptable performance, nor do they enjoy the procedural rights afforded competitive service employees such as notice and a right to representation in unacceptable performance cases. Schedule B employees compete in different tenure groups from competitive service workers, and thus cannot bump or displace them in the event of a reduction-in-force ("RIF"). Moreover, Schedule B employees may not be promoted or transferred to GS–9 or higher level positions, or to other competitive service positions, without taking an examination, and where such an examination is given, Schedule B employees must compete with outside applicants. Competitive service employees, by contrast, are not required to undergo an examination in order to advance beyond the GS–5 and 7 levels, nor must they compete with outside applicants for career ladder promotions.

Since the abolition of the PACE, OPM has developed only three job-specific competitive tests, including one for the entry level position of customs inspector, which was implemented December 22, 1985. *See* March 31, 1986 Stipulation of Facts, ¶ 1. The position of GS–5/7 customs inspector has thus been converted to competitive status. *Id.* All incumbent GS–5/7 customs inspectors with at least six months satisfactory service prior to the date of the conversion are eligible for conversion to competitive service status. *Id.* at ¶ 2. The four named plaintiffs have all been converted. *Id.* at ¶¶ 3 and 4.

## II.

Defendants contend that plaintiffs lack standing to maintain this action, arguing that the harms alleged are purely speculative or conjectural and that, in any event, the possibility of such harms has been eliminated by the conversion of the entry level customs inspector position to competitive status and the subsequent conversion of the named plaintiffs to such status.

■ Plaintiffs offer several arguments in response, three of which the Court finds unavailing. First, NTEU argues, albeit without much conviction, that it has standing in its own right because OPM's actions have interfered with its ability to provide services to those union members who are Schedule B employees. The only example of such interference it offers, however, is the possibility that Schedule B employees will be less inclined to join the union because NTEU cannot represent them before the Merit Systems Protection Board or in arbitration in cases of adverse performance appraisals, since excepted service employees lack the right to such protections. This is far too remote or speculative an injury, however, upon which to rest a finding of standing. *Cf. National Treasury Employ-*

*ees Union v. Devine,* 577 F.Supp. 738 (D.D. C.1983) (regulations interfered with NTEU's ability to negotiate collective bargaining agreements dealing with a variety of important employment issues *on behalf of its present members* ). Second, with respect to the defendants' arguments concerning the conversion of the customs inspectors to competitive service, plaintiff recites the familiar rule that the voluntary cessation of allegedly illegal activity will not moot an action unless it is reasonably likely that the challenged activity will not recur. It would, however, defy reason to accept that OPM, having gone to the expense of validating and implementing a job-specific examination for customs inspectors, will simply abolish that test and return the position to the excepted service if this case is dismissed. Whatever the validity of the agency's decision to place the 118 entry level jobs under Schedule B, that action was taken in response to a specific event—the *Luevano* Consent Decree. There is no reason to believe that OPM will make a practice of such drastic measures, and indeed, the requirements of the Decree make it very unlikely that it would do so.

■ Finally, plaintiffs argue that the converted customs inspectors have sustained injury despite their conversion, because they did not receive their promotions to the GS–9 level as promptly as they would have had they been competitive service employees, thereby suffering a loss of pay. In *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), the Supreme Court ruled that neither the Classification Act nor the Back Pay Act permitted recovery of retroactive promotions and backpay, and that, in the absence of any statutory provision creating a substantive right to such recovery, the United States has not consented to be sued for such damages. Plaintiffs here rely on the Federal Circuit's observation in *Boese v. Dep't of Air Force,* 784 F.2d 388 (Fed.Cir.1986), that if an employee can " 'clearly establish' that he would in fact have been promoted," he may be entitled to retroactive back pay. *Id.* at 390. In offering this dictum, however, the *Boese* court cited *Power v. United States,* 597 F.2d 258, 220 Ct.Cl. 157 (1979),

where the Court of Claims noted that such recovery normally required a showing of legal entitlement, but that "[p]ossibly the Federal Personnel Manual (in effect at that time) *may qualify this requirement somewhat....*" *Id.,* 597 F.2d at 262 (emphasis supplied). In the face of *Testan's* unequivocal language, this Court declines to base a finding of standing on the tenuous theory advanced by plaintiff—that the now-converted customs inspectors *may* be able to clearly establish that they would have been promoted sooner, and that such a showing may be sufficient, as a legal matter, to permit such a recovery against the sovereign.

■ Nevertheless, the Court is convinced that an obvious injustice would occur were this case dismissed for lack of standing simply because the four named individuals have been converted to competitive status. NTEU brought this suit not only on behalf of the four named plaintiffs and all other union members employed by the Customs Service, but also on behalf of "all employees receiving a GS–5/7 ... position Schedule B appointment since August 31, 1982." Complaint at ¶ 38. In seeking to institute this suit as a class action, NTEU alleged that the harms suffered by all such employees are the same, *id.* at ¶¶ 40–41, and sought by way of relief, the establishment of "a competitive examination for *all* GS–5/7 ... positions." *Id.* at ¶ A (emphasis supplied). By Order dated January 18, 1985, the Court granted plaintiffs an extension of time until thirty days after the disposition of the now-pending cross-motions for summary judgment within which to move for certification of this proposed class. While defendants would have this Court dismiss the case because the four named plaintiffs are no longer excepted service employees, it is clear that the harms alleged in the complaint would continue with respect to other members of the proposed class. Nothing in the complaint or in any of the parties' other filings suggests that these alleged harms are in any way unique to customs inspectors, or that they differ depending upon an employee's job. On the contrary, the complaint itself states that the harms are the same for *all* Schedule B employees. Nor is there any

reason to believe, as defendants suggest, that NTEU could not adequately represent the interests of such employees. The union represents some 110,000 federal employees, of which only 15,000 are employed by the Customs Service. The complaint states that this representation includes federal employees "who have been appointed to 'Schedule B' positions which had previously been filled as competitive service positions." *Id.* at 1. It nowhere suggests that the *only* Schedule B employees it represents are customs inspectors. It appears, therefore, that the union includes excepted service employees other than customs inspectors. It is well settled that an association such as a union has "representational" standing where it alleges "that its members, or any one of them, are suffering immediate or threatened harm...." *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975). While it appears that NTEU represents federal employees other than customs inspectors who have been appointed to Schedule B positions previously filled by competitive examination, the Court cannot rest its finding of standing, and thus its exercise of jurisdiction, solely on an assumption. The union, therefore, must file an amended complaint within thirty days from the date of this order, naming as plaintiffs one or more union members who have been appointed to a Schedule B position, other than that of customs inspector, where such position was previously filled as a competitive service position. A failure to make such a filing timely will be construed as a declaration by NTEU that none of its members fall within this description, and an order will then be entered dismissing this action for lack of standing.

In anticipation that NTEU will in fact be able to make such a showing, the Court will address defendants' remaining contention as to why plaintiffs lack standing, namely, that the alleged harms plaintiffs recite are too conjectural or speculative to confer standing upon excepted service employees. While it is true that plaintiffs have not identified any excepted service employees who have been RIFed, demoted or removed, and thereby suffered the consequences of Schedule B's inferior status,

as plaintiffs note, a sufficiently immediate threat of injury is enough to confer standing. *Valley Forge Christian College v. Americans For Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). Here, the threats facing plaintiffs are several: a lack of procedural protections in the event of an adverse performance appraisal, inferior job retention rights in the event of a RIF, and increased competition for promotions within career ladders, to name the most significant. While defendants attempt to dismiss these as conjectural or speculative threats, this Circuit has concluded that parties alleging similar harms had standing to seek redress. In *International Union of Bricklayers v. Meese,* 761 F.2d 798 (D.C. Cir.1985), for example, the Court of Appeals found that a union had standing to challenge government guidelines allowing aliens to enter the country and perform certain types of work which "would otherwise *likely* go to union members." *Id.* at 802 (emphasis supplied). Appellants in that case claimed that the alien workers "represent competition which [the union members] would not face if the Government followed the procedures required by law." *Id.; see also Autolog Corp. v. Regan,* 731 F.2d 25, 31 (D.C.Cir.1984) (loss of employment opportunities sufficient to confer standing). So too here, the excepted service employees contend they would not face outside competition for promotion to the GS–9 level but for OPM's action. Even more to the point is *National Treasury Employees Union v. Devine,* 577 F.Supp. 738 (D.D.C.1983), *aff'd,* 733 F.2d 114 (D.C. Cir.1984), a case in which OPM also raised objections to this union's standing to challenge implementation of new agency personnel rules. There, as here, NTEU challenged changes affecting the performance management system and rules governing RIFs, and OPM argued that the union lacked standing since none of its members had in fact been adversely affected by the new rules. The district court concluded, however, that because the challenged regulations had a "far reaching impact on day-to-day working situations *and an employee's career, dealing with job retention rights, performance appraisals, [and] promotions,"* the union had standing to

bring suit. *Id.* at 744. Plaintiffs allege precisely the same harms here, and this Court concludes, as did the district court in *NTEU v. Devine,* that the threat of such harms is sufficiently immediate to confer standing on plaintiffs, without the necessity of waiting until a given plaintiff is demoted, fired, RIFed or denied a promotion.[1]

Accordingly, for the reasons set forth above, plaintiffs are hereby directed to file within thirty days from the date of this opinion an amended complaint naming as plaintiff or plaintiffs one or more members of NTEU who are employed in positions currently classified as excepted service positions under Schedule B which, prior to the abolition of the PACE, were in the competitive service. In the event that plaintiffs fail to timely make such a filing, the case will be dismissed for lack of standing. Otherwise, the Court will proceed to address the remaining issues raised by the cross-motions, without further briefing by the parties.[2]

SO ORDERED.

---

1. Indeed, plaintiffs argue that they suffer actual present harm by virtue of their excepted service status. In *Allen v. Heckler,* 780 F.2d 64 (D.C.Cir. 1985), the Court of Appeals concluded that because of the inferior benefits attendant on excepted service status, an agency's decision to hire disabled individuals only as excepted service employees was discriminatory. Nowhere did the Court suggest that the plaintiffs' showing of discrimination turned on whether any of them had actually suffered the consequences of their excepted service status; the mere fact of their employment status was sufficient.

2. This Order, of course, does not preclude defendants from challenging the standing of any plaintiffs named in the amended complaint.